IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-1370-07





RASHIK ALI TAYLOR, Appellant



v.



THE STATE OF TEXAS
 




ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIRST COURT OF APPEALS


HARRIS COUNTY





 Price, J., delivered the opinion of the Court in which Meyers, Johnson,
Holcomb and Cochran, JJ., joined. Womack, J., filed a concurring opinion in which
Keller, P.J., and Keasler and Hervey, JJ., joined. 


O P I N I O N



 The appellant was convicted of the offense of aggravated sexual assault of a child
younger than fourteen. (1) The jury assessed his punishment at ten years' confinement in the
penitentiary. The evidence against the appellant consisted of the testimony of the
complaining witness, J.B., and a licensed professional counselor who had been counseling
J.B. for some months after the offense came to light. On appeal, the appellant argued that
certain testimony from the counselor, summarizing what J.B. had told her about the offense,
had been improperly admitted over his hearsay objection. The First Court of Appeals held
that the counselor's testimony was admissible under the hearsay exception for statements
made for purposes of medical diagnosis or treatment. (2) We granted the appellant's petition
for discretionary review to examine whether the hearsay exception embodied in Rule 803(4)
of the Texas Rules of Evidence should apply under the circumstances. (3)

FACTS AND PROCEDURAL POSTURE

At Trial

 The complaining witness, J.B., was thirteen years old at the time of the offense, and
fourteen when she testified. She had been living mostly with her grandmother for the past
two or three years because her mother was a drug abuser and a prostitute, "in and out of jail." 
She was a good student who admitted that she could probably do even better in school. At
least on a cold record, she gives the impression of possessing a certain street savvy. The
following account derives entirely from J.B.'s testimony, which made up the bulk of the
State's case against the appellant. There was no forensic evidence to back up her story.

 Sometime in March of 2005, while J.B. was on her spring break from school, she met
the appellant, who was her mother's friend, for the first time. She knew him only by his
nickname, "Skinny Man." Several weeks after she first met the appellant, J.B. was in a motel
room one evening with her mother and "Uncle Lazy," a drug dealer who was the boyfriend
of J.B.'s aunt. J.B. and her mother were drinking wine. Soon J.B.'s mother begin to crave
drugs, so Uncle Lazy and J.B. drove her in a borrowed van to an apartment complex where
she could prostitute herself for cocaine. Later, J.B.'s mother called to say that her abusive
ex-boyfriend had abducted her and asked J.B. to call the appellant. The appellant drove to
the motel and picked up J.B. and Uncle Lazy. He offered them cocaine, then suggested that
Uncle Lazy go by himself to rescue J.B.'s mother. Uncle Lazy refused to leave J.B. alone
with the appellant, so all three of them got into the appellant's car. The appellant put his
hand on J.B.'s leg, but she pushed it off. They drove to the motel in which the appellant was
staying. J.B. accompanied the appellant to his room, where he retrieved a nine-millimeter
gun. While in the motel room, the appellant told J.B. that he wanted her and her mother to
move in with him. "And then he was like, well, I just want to spend time with you, all this
kind of stuff."

 They left the motel and drove to another apartment complex that J.B. did not
recognize. The appellant and Uncle Lazy got out of the car and began a conversation at the
rear of the vehicle that J.B. did not pay attention to. But then she noticed that the appellant
had pulled out his gun and was pointing it at Uncle Lazy. J.B. then "jumped in front of the
gun and grabbed my uncle." The appellant tried to wrest her from Uncle Lazy, and pulled
out a different, smaller caliber gun and held it to J.B.'s head. J.B. let go of Uncle Lazy and
let the appellant put her back in the car. But she immediately jumped out of the window and
began to run through the apartment complex. She heard a gun shot and assumed that the
appellant had shot Uncle Lazy. (4) When it became clear to J.B. that the appellant was going
to catch her, she stopped running. He took her back to the car. She did not see Uncle Lazy
anywhere. The appellant then drove her back to his motel.

 Once back at the motel, J.B. tried to run again, but the appellant found her and took
her to his room. There they did several lines of cocaine, (5) and then the appellant asked J.B.
to lie on the bed and disrobe. She did so because she felt "threatened and intimidated." The
appellant then disrobed and had sex with J.B. She testified that it hurt the entire time, and
she tried to push him off. "And every time I said stop or pushed harder, it would be - so I
just gave up. * * * I'm wasting my energy. The more - I knew the more I fight the longer
it would take. I knew that. So I just stopped." J.B. estimated that the assault lasted between
one-and-a-half and two-and-a-half hours. When it was over, the appellant threw a bag of
crack cocaine in her lap and told her it was for her mother, leading J.B. to suspect that her
mother may have prostituted her to the appellant in exchange for drugs. The appellant then
took J.B. back to her mother's motel, where her grandmother was waiting to take her home.

 Because J.B. had been truant, a counselor from school called her over the weekend. 
J.B. asked the counselor, "[W]hat does rape mean?" On Monday, J.B. disclosed her ordeal
to the school counselor, who in turn reported it to Child Protective Services. J.B. eventually
underwent a medical examination, but only to determine whether she was pregnant or had
contracted any sexually transmitted disease. About a month after the assault, J.B. began to
see a therapist "through Child Advocacy."

 Q. Now, you also stated you started getting therapy. What were you
getting therapy for?


 A. Post traumatic stress disorder. A little bit before all this had
happened like towards the end of February beginning of March I had been
diagnosed as bipolar. CPS thought it was best that I started to receive therapy. 
They didn't want me to start cutting myself because of what had happened. (6)


 Q. So did you start seeing a therapist?


 A. I started seeing a therapist.


 Q. Do you know when that was?


 A. That was - it started - like it started like a month or so after
everything had happened. Like CPS got like really, really got involved and
everything.


 Q. Are you still seeing a therapist to this day? (7)


 A. Yes.


 Q. What's your therapist's name?


 A. Denise Fuller.


On cross-examination, J.B. confirmed that she had talked about "this incident" with Denise
Volet. It is not clear whether Denise Volet and Denise Fuller are one and the same. (8)

 Denise Volet testified that she is a licensed professional counselor, formerly with
Child Protective Services and in private practice at the time of trial, with extensive
experience counseling victims of sexual assault and abuse. According to Volet, J.B. had
begun therapy with another therapist at the Child Advocacy Center, but "there was a conflict
of interest there since they work with CPS and everything, so [J.B.] was referred to me." (9) 
J.B. began therapy with Volet on June 24, 2005, at least several months after the offense. (10) 
Volet had been seeing J.B. on a weekly basis right up until the time of trial. The portion of
her testimony that is relevant to the issue in this case is as follows:

 Q. And what sort of issues are you working with [J.B.] on?


 A. The resolution of the rape and the sexual assault. The resolution of
the mother/daughter issues. Anger management. Learning how to control her
own behaviors and making the right choices. And judgment decisions.


 Q. Did she tell you the facts about the rape?


 A. She did give me some details.


 Q. What details did she give you?


 [DEFENSE COUNSEL]: Objection. Calls for hearsay.


 [PROSECUTOR]: This is a statement made for diagnosis or treatment,
Your Honor.


 [DEFENSE COUNSEL]: Although she is a licensed counselor, if I can
ask her a question or two on voir dire before you make a decision on this? 
Would that be okay, Your Honor?


 THE COURT: Okay. Take her on voir dire.


VOIR DIRE EXAMINATION


 BY [DEFENSE COUNSEL]:


 Q. Are you a medical doctor?


 A. No, sir.


 Q. Are you a psychiatrist?


 A. No, sir.


 Q. Are you under the supervision of a medical doctor or psychiatrist?


 A. No, sir.


 Q. You're not connected to any kind of medical doctor or psychiatrist
in any way?


 A. No, sir.


 [DEFENSE COUNSEL]: Your Honor, I object. These are hearsay
statements that are not made in the course of treatment.


 [PROSECUTOR]: She is a licensed therapist treating [J.B.] for the
issues that she described.


 THE COURT: Overruled.


DIRECT EXAMINATION (continued)


 BY [PROSECUTOR]:


 Q. What did she tell you about what had happened?


 A. She referred to the gentleman as Skinny. That's the name that she
had for him. And how basically her mother had sent her to go with him. They
went to a motel. She talked about being in a car. Talked about there being a
gun. She talked about going upstairs into the room. Being afraid, knowing
that something wasn't right and was going to happen. Skinny asking her to
take her clothes off and her telling him she didn't want to. And trying to resist. 
She talked about the gun being on the night stand on the table. Her taking her
clothes off. Getting on the bed. Skinny having sex with her. That it hurt. 
And she tried to get away from him and just couldn't. Then when it was over
she talked about, you know, leaving. Being in the car. At some point the gun
was in her lap for some reason. And she talked about that she had the thought
of I just should shoot him now. She talked about doing drugs. Doing cocaine. 
I remember cocaine. I don't remember exactly what it was they drank. But
she had been drinking and doing drugs. Had been given those things. She
remembered getting out of the car. And what's typical of a victim of rape or
abuse.


* * *


 Q. What issues were you addressing with her regarding the rape? What
was her reaction to the rape?


 A. Anger, number one. She was a very angry young lady. Betrayal she
felt from her mother.


Volet then went on to describe characteristics that are common to children who have suffered
from sexual abuse and indicated that J.B. displayed some of these characteristics. (11) Based
upon this evidence, (12) the jury convicted the appellant and, after a punishment hearing,
sentenced him to serve a term of ten years in the penitentiary.

On Appeal

 On appeal, the appellant argued that the trial court erred in admitting Volet's
testimony as a statement made for the purpose of medical diagnosis or treatment over his
hearsay objection. The court of appeals affirmed his conviction, however, holding that the
trial court did not abuse its discretion to admit the testimony. (13) The court of appeals noted
that both the federal courts and some Texas courts have held that the hearsay exception at
issue may extend to statements made to professional counselors and psychotherapists. (14) 
Noting also that J.B. testified that she was in therapy for post-traumatic-stress disorder, the
court of appeals found it reasonable to infer that she understood that the purpose of her
therapy was to treat a medical condition. (15) The court of appeals also found that J.B.'s
statements to Volet were reasonably pertinent to "her issues concerning the resolution of the
sexual assault." (16) Given this state of the record, the court of appeals held that the trial court
did not abuse its discretion to admit Volet's testimony recounting J.B.'s out-of-court account
of the circumstances of the sexual assault.

 Justice Jennings concurred in the result only. (17) Noting his agreement with several
decisions from the Austin Court of Appeals, (18) he opined that the hearsay exception for
statements made for purposes of medical diagnosis or treatment should not be interpreted to
cover statements made for purposes of mental-health treatment. (19) He also rejected any
construction of the exception that would allow admission of statements made in the course
of long-term counseling or psychotherapy, after a diagnosis has been made and a course of
treatment decided upon, since, in his view, the rationale underlying the exception would no
longer apply. (20) Because he viewed the error as harmless, however, he concurred in the
majority's decision to affirm the trial court's judgment. (21) We granted the appellant's petition
for discretionary review in order to address and resolve the apparent conflict in the courts of
appeals with respect to the proper scope of Rule 803(4). (22)

THE LAW

The Rule

 "Hearsay is not admissible except as provided by statute or [the Rules of Evidence]
or by other rules prescribed pursuant to statutory authority." (23) Once the opponent of hearsay
evidence makes the proper objection, it becomes the burden of the proponent of the evidence
to establish that an exception applies that would make the evidence admissible in spite of its
hearsay character. (24) One such exception is embodied in Rule 803(4), which provides:

 The following are not excluded by the hearsay rule, even though the
declarant is available as a witness:


* * *

 (4) Statements of Purposes of Medical Diagnosis or Treatment. 
Statements made for purposes of medical diagnosis or treatment and
describing medical history, or past or present symptoms, pain, or sensations,
or the inception or general character of the cause or external source thereof
insofar as reasonably pertinent to diagnosis or treatment. (25)


In determining whether a trial court erred in admitting or excluding hearsay evidence under
such an exception to the hearsay rule, a reviewing court looks to see whether the trial court
clearly abused its discretion; before the reviewing court may reverse the trial court's decision,
it must find the trial court's ruling was so clearly wrong as to lie outside the zone within
which reasonable people might disagree. (26) Of course, the trial court's discretion must be
informed by a proper understanding of the law. In the instant cause, the disagreement
between the majority and concurring opinions below turned upon a difference in their
construction of Rule 803(4)--a disagreement as to the scope of the law--rather than a
dispute as to how well-settled law should be applied to the facts of this case.

 Because our Rule 803(4) is identical to its federal counterpart in the Federal Rules of
Evidence, (27) it is appropriate to look to federal cases and commentary for guidance in its
proper construction. (28) When we canvass both the federal case law and also cases from our
own courts of appeals construing our Rule 803(4) in light of the federal case law, we find a
core area of consensus, but also some fundamental disagreements on the periphery. What
follows is a description of that case law, particularly as it bears upon the specific question
before us: Does Rule 803(4) provide for the admissibility of statements made to a licensed
professional counselor in the context of on-going, long-term therapy?

Federal Case Law

 The Eighth Circuit Court of Appeals has taken the lead in construing Federal Rule
803(4). (29) In the seminal case of United States v. Iron Shell, (30) the nine-year-old victim of an
assault with intent to commit rape was examined by a physician on the same evening that the
offense occurred. The physician testified at trial to the victim's description of the offense
during the examination. (31) The issue in the appeal was whether that description was
"pertinent to the diagnosis or treatment" of the victim. (32) The court of appeals held that the
evidence constituted a description of the general character of the cause of the victim's
vaginal injury and therefore fell within the parameters of Rule 803(4). (33) Along the way, the
Eighth Circuit made the following observations about Rule 803(4):

 The rationale behind the rule has often been stated. It focuses upon the patient
and relies upon the patient's strong motive to tell the truth because diagnosis
or treatment will depend in part upon what the patient says. It is thought that
the declarant's motive guarantees trustworthiness sufficient to allow an
exception to the hearsay rule. * * * Judge Weinstein, in his treatise, suggests
another policy ground. He writes that "a fact reliable enough to serve as the
basis for a diagnosis is also reliable enough to escape hearsay proscription." 
[4] Weinstein & Berger, [Weinstein's Evidence] at 803-129 [1979]. This
principle recognizes that life and death decisions are made by physicians in
reliance on such facts and as such should have sufficient trustworthiness to be
admissible in a court of law. * * * Thus, two independent rationales support
the rule and are helpful in its application. A two-part test flows naturally from
this dual rationale: first, is the declarant's motive consistent with the purpose
of the rule; and second, is it reasonable for the physician to rely on the
information in diagnosis or treatment. (34)


Applying the first part of this test, the court of appeals observed that there were no facts in
the record that the victim's motives in describing the assault to the physician "was other than
as a patient seeking treatment." (35) Because the physician expressly explained in his testimony
that knowing the cause of the injury had been important in guiding his physical examination
of the victim, telling him what to look for and what not to look for, the court of appeals also
held that it had been reasonable for him to rely on the victim's statement in making his
diagnosis and deciding on treatment. (36)

 The Advisory Committee Notes to Federal Rule 803(4) indicate that statements as to
"fault" are not typically pertinent to diagnosis or treatment, and are therefore not admissible
consistent with the rationale behind the rule. (37) In Iron Shell, the court of appeals had pointed
out that the victim's statement had not included information as to the identity of her assailant,
and observed in dicta, with specific reference to the Advisory Committee Note, that such
information would "seldom, if ever," be pertinent to diagnosis or treatment. (38) In United
States v. Renville, (39) the Eighth Circuit squarely confronted the question whether an eleven-year-old victim's statement made to a physician during an examination following a sexual
assault that actually identified her assailant was admissible under Rule 803(4). 
Notwithstanding its dicta in Iron Shell, the Eighth Circuit held in Renville that "[s]tatements
by a child abuse victim to a physician during an examination that the abuser is a member of
the victim's household are reasonably pertinent to treatment." (40) The physician in Renville
had specifically testified that child abuse involves more than just physical injury, and that
part of the medical evaluation includes an assessment of "the emotional and psychological
injuries which accompany the crime." (41) Furthermore, the doctor testified, "[t]he exact nature
and extent of the psychological problems which ensue from child abuse often depend on the
identity of the abuser." (42) Indeed, if the abuser is a family member, it would be important to
intervene to see that the child is removed from harm's way. (43) For these reasons, the court of
appeals in Renville concluded that the victim's statement, including the identity of the
perpetrator, was shown to be pertinent to her diagnosis and treatment. (44)

 The Renville court then turned to the question of whether the victim had been
motivated by the knowledge that her statement had been made for purposes of diagnosis or
treatment. The court of appeals observed that the physician had expressly explained to the
victim that the questions he asked her as part of his examination "were necessary to obtain
information to treat her and help her overcome any physical and emotional problems which
may have been caused by the recurrent abuse." (45) At least "where the physician makes clear
to the victim that the inquiry into the identity of the abuser is important to diagnosis and
treatment, and the victim manifests such an understanding[,]" the court of appeals concluded,
the rationale behind the hearsay exception is served. (46) Because nothing in the record
suggested that the victim's motive during the examination had been anything "other than as
a patient responding to a physician questioning for prospective treatment[,]" the court of
appeals held that her out-of-court statements to the doctor were wholly admissible. (47)

 The first Eighth Circuit opinion dealing with the out-of-court statement of a child
victim made to a non-physician, but nevertheless offered under Rule 803(4), is United States
v. DeNoyer. (48) After he was abused by his father, the five-year-old victim was placed in a
foster home and was interviewed by several social workers while he was there. Without any
discussion of the fact that the social workers were not doctors, or that they had not even
interviewed the child at the behest of any doctor, the Eighth Circuit merely cited Renville for
the proposition that statements of child victims that identify the assailant may be reasonably
pertinent to diagnosis or treatment, and therefore admissible under Rule 803(4), and affirmed
the conviction. (49) Over the next few years, the Eighth Circuit held "that statements about
abuse, including the identity of the abuser, made by a child to a trained social worker or
psychologist pursuant to diagnosis or treatment for emotional or psychological injuries are
admissible under Rule 803(4)." (50) These holdings are consistent with the position of the
Advisory Committee that statements for the purpose of diagnosis and treatment need not
necessarily be made to a physician. (51) But they do not discuss whether the social workers,
counselors, or psychologists made clear to the children the importance of telling the truth
about the identity of their assailants, or whether the children manifested such an
understanding, so as to satisfy the first part of the two-part test from Iron Shell, viz., that the
declarant's motive is consistent with a purpose of facilitating diagnosis or treatment. (52)

 More recent Eighth Circuit holdings, however, have returned to the explicit two-part
test first announced in Iron Shell and elaborated on in Renville. These more recent holdings
have emphasized the requirement that the record reflect, in cases involving child victims,
both 1) that the physician (or counselor or psychologist) explained the importance of
knowing the true identity of the assailant to the efficacy of the diagnosis or treatment and 2)
that the child manifested an understanding of the need to be truthful. For example, in Olesen
v. Class, (53) the court of appeals held that a physician's testimony that a five-year-old victim's
statement identifying the defendant as her assailant was inadmissible. The doctor's testimony
should not have been admitted, the court of appeals declared, because there was "no evidence
in the record that he explained to [the victim] that his questions regarding the identity of her
abuser were important to diagnosis or treatment, or that [the victim] . . . understood the
medical significance of being truthful in identifying her abuser to her doctor." (54)

 Similarly, in United States v. Gabe, (55) while acknowledging that a statement
identifying an abuser may be admissible under Rule 803(4), the court of appeals held the
physician's testimony in that case inadmissible because the Government, as proponent of the
evidence, failed to satisfy the "rigorous standard" of Renville to show that the doctor
explained to the child-victim the importance of that information to his diagnosis or treatment
and that the child manifested an understanding of same. (56) Responding to the Government's
argument that the fifteen-year-old victim was old enough to understand the importance of
telling the truth to a medical care-giver, the court of appeals observed:

 We agree that most adults and older children generally understand a
physician's role in providing diagnosis and treatment. But not even an adult
necessarily understands the connection between a sex abuser's identity and her
medical treatment. Rule 803(4) is premised on the patient's selfish motive in
receiving proper medical treatment; therefore, the proponent must establish
that the declarant's frame of mind when making the hearsay declaration "was
that of a patient seeking medical treatment." (57)


The Eighth Circuit has recently applied the same "rigorous standard" in the context of out-of-court statements that child victims have made to psychologists and counselors. (58)

 Other federal courts of appeals have determined that a child-victim's statement
identifying her assailant to a treating or diagnosing doctor, psychologist, therapist, or
counselor is admissible under Federal Rule 803(4). They have generally done so without
resort to the "rigorous standard" that the Eighth Circuit applies; instead, they have found such
child-victims--as a class--to be motivated to tell the truth, without inquiring about the
particulars of the individual medical or therapeutic evaluation. (59) Indeed, the Tenth Circuit
has expressly rejected the Eighth Circuit's two-part test as "not contemplated by the rule and
. . . not necessary to ensure that the rule's purpose is carried out." (60) The Ninth Circuit has
opined that the fact that a child may actually be too young to appreciate that her statements
given for purposes of medical diagnosis or treatment should be truthful goes only to "the
weight of the hearsay statements rather than their admissibility." (61)

Texas Case Law

 This Court has rarely construed Rule 803(4); (62) we have yet to speak to the questions
raised in this petition. But a number of the courts of appeals have. The courts of appeals
have long held that the witness relating an out-of-court statement made for the purpose of
diagnosis or treatment need not be a physician for the statement to be admissible. The out-of-court statements of child-abuse victims identifying the perpetrator of the abuse to 
psychologists, (63) therapists, (64) licensed professional counselors, (65) and even, under some
circumstances social workers, (66) have all been admitted into evidence under Rule 803(4)--so
long as the statement at issue otherwise met the criteria of the rule.

 The earliest Texas cases to address the criteria for admissibility of child-victim
statements to treating physicians cited Renville for the proposition that out-of-court
statements relating the identity of the assailant are "reasonably pertinent to diagnosis or
treatment" in contemplation of Rule 803(4). (67) Without further discussion, each of these cases
held that the statements were admissible. Thus, early Texas cases seemed to rely only on the
second part of the two-part test from Iron Shell. (68) None of these early cases went on to
inquire (as the Eighth Circuit did in Renville), as to the first part of the two-part Iron Shell
test--whether the record showed that the child-victim had understood that she had made the
statement for the purpose of diagnosis or treatment, or had been made aware of the
importance for that purpose of telling the truth about the identity of her assailant (where that
fact is indeed pertinent to diagnosis or treatment).

 A little later the courts of appeals did begin to pay some heed to the first part of the
Iron Shell test. They began to recognize the need for a record that would establish that the
child-victim appreciated that her statement was made for the express purpose of diagnosis
or treatment. (69) Even so, the cases did not require, as the later Eighth Circuit cases do, that
the record show that the physician, psychologist, counselor, etc., expressly informed the child
that the purpose of her statements was to facilitate diagnosis or treatment, or that she
manifested an understanding of that purpose. Especially with older children, so long as the
record circumstantially supports an inference that the child understood the purpose of her
statement, the courts of appeals have held that Rule 803(4) is satisfied. (70) Moreover, we have
yet to find a Texas case that has addressed the specific question of whether, as a prerequisite
to admitting a child-victim's out-of-court statement that identifies her assailant, the record
must show that she was specifically informed by her physician (or psychologist or counselor),
and manifested an understanding, of the importance of that particular information to her
diagnosis or treatment.

 The Austin Court of Appeals has taken a somewhat narrower view of Rule 803(4)
than have other Texas courts of appeals. In Moore v. State, (71) two teenage sexual-assault
victims began therapy sessions with a licensed clinical psychotherapist/social worker within
weeks of their outcry. (72) They remained in therapy, once or twice a week, sometimes
individually and sometimes in a group, right up to the time of trial. (73) The court of appeals
held that the therapist's testimony of statements made by the two girls describing specific
instances of abuse was inadmissible under Rule 803(4) because the State did not carry its
burden to demonstrate that the therapist was engaged in medical diagnosis or treatment. The
court reasoned that "to ensure that the medical treatment exception's assumption that patients
seeking medical care will be honest and truthful in relaying symptoms in order to obtain
proper and effective treatment remains intact, the offered witness's qualifications must be
shown to conform to the rule." (74) But "[b]ecause the record does not have sufficient
information for us to determine that [the therapist] has received medical training and can
qualify as a member of the medical profession," the court of appeals held that Rule 803(4)
was not satisfied. (75)

 In a separate, concurring opinion in Moore, Justice Patterson expressed the view that
the statements in issue were also inadmissible for a different reason. (76) Pointing out that the
statements had been made in the context of on-going, long-term therapy occurring years after
the offenses alleged, she argued that there was no reason to believe that the assumption
underlying the rule would still apply "or that [the victims'] frame of mind was comparable
to a patient seeking treatment." (77) In Jones v. State, (78) writing for a majority, Justice Patterson
elevated the view she expressed in Moore to a holding of the court, reasoning that the selfish
motive to tell the truth "is no longer present once a diagnosis has been made and treatment
has begun. The details a patient may report during an extended course of treatment may be
prompted by other motives, such as denial or deception, or be influenced by the treatment
process itself." (79) Accordingly, the court of appeals held that the statements made by the nine-year-old complainant to a licensed professional counselor over the course of a ten-month
period of therapy, continuing up to the time of trial, were inadmissible.

 Soon the Austin Court would consolidate the holdings of Moore and Jones, in Perez
v. State. (80) There, the twelve-year-old declarant began therapy with a licensed professional
counselor nine months after her initial outcry. (81) The counselor was not licensed to practice
medicine and was not working under the supervision of a physician or psychologist. (82) The
court of appeals held that the trial court erred in admitting the declarant's hearsay statements
to the counselor both because the counselor was "not shown to be a medical professional,"
and because "the statements were made during an extended period of counseling and did not
possess the guarantees of the trustworthiness on which the medical diagnosis and treatment
exception to the hearsay rule is founded." (83) Not surprisingly, it is these three cases from the
Austin Court of Appeals that the appellant in this case relies upon most prominently.


ANALYSIS

 Based upon the Austin Court of Appeals cases, the appellant argues that Volet's
testimony relating the details of what J.B. told her in therapy sessions was inadmissible for
two reasons. First, Volet's qualifications as a medical professional were not shown to
"conform to the rule." (84) Second, because the therapy sessions occurred at least several
months after the charged offense, any statements J.B. made in that context lack the
guarantees of trustworthiness that otherwise undergird the hearsay exception. We reject the
appellant's first argument as contrary to the intent of the drafters and the weight of
persuasive case authority. But, at least on the facts of this case, we agree with the appellant
with respect to his second argument.

Medical Qualifications?


 We reject the notion, implicit in the Austin Court's holdings, that before a witness can
relate the out-of-court statement made for purposes of medical diagnosis or treatment under
Rule 803(4), the witness must be shown to have medical "qualifications" that "conform to
the rule." (85) It is clear that the drafters of the federal rule did not think so, for they expressly
designated that in order for the exception to apply "the statement need not have been made
to a physician." (86) Indeed, "[s]tatements to hospital attendants, ambulance drivers, or even
members of the family might be included." (87) Certainly a family member will not typically
have any "qualifications" in the medical profession. The essential "qualification" expressed
in the rule is that the declarant believe that the information he conveys will ultimately be
utilized in diagnosis or treatment of a condition from which the declarant is suffering, so that
his selfish motive for truthfulness can be trusted. That the witness may be a medical
professional, or somehow associated with a medical professional, is no more than a
circumstance tending to demonstrate that the declarant's purpose was in fact to obtain
medical help for himself. A declarant's statement made to a non-medical professional under
circumstances that show he expects or hopes it will be relayed to a medical professional as
pertinent to the declarant's diagnosis or treatment would be admissible under the rule, even
though the direct recipient of the statement is not a medical professional. (88) To the extent that
Moore and Perez may be read to hold otherwise, we expressly overrule them.

 Here, J.B. did not make her statements to Volet with the understanding that Volet
would relay them to a medical doctor. But we do not regard it as absolutely essential under
the rule that the ultimate diagnosing or treating entity be a physician, or that the statement
be made for purposes of diagnosing or treating a strictly physical ailment. As it has been
universally recognized since the Eighth Circuit first addressed the issue in Renville, the
medical community "must be attentive to treating the emotional and psychological injuries
which accompany" crimes against children. (89) A statement made for the purpose of
facilitating a child-declarant's own mental health may carry the same self-interested motive
as a statement made to facilitate the declarant's physical well-being. If so, there is no reason
to exclude it from Rule 803(4)'s ambit, regardless of whether the care-giver is a psychiatrist
(and hence, a physician) or some other trained mental-health professional.

 Of course, there may be other considerations to take into account in the case of a
statement made for purposes of mental-health diagnosis or treatment. For example, the
declarant's mental illness or disorder must not be of such a nature or degree as to disable him
from appreciating his own self-interest in telling the truth to his care-giver. This is so both
for purposes of diagnosis and treatment. Moreover, and especially in the context of mental-health treatment (as opposed to diagnosis), it must be the case that truth-telling is important
to the efficacious treatment of the mental illness or disorder, and that the declarant has an
awareness (and is competent to appreciate the fact) that truth-telling is important. The focus,
in short, is on the declarant's perception. If a child-declarant can and does believe that his
statement to a mental-health professional will facilitate his diagnosis or treatment, we think
that his out-of-court statement should be admissible under Rule 803(4), whether or not the
mental-health professional is, strictly speaking, a member of the "medical profession." (90) 
Again, to the extent that the opinions of the Austin Court of Appeals can be read to the
contrary, we overrule them.

 J.B. testified that she was in therapy for post-traumatic-stress disorder (PTSD), a
recognized mental disorder. (91) Volet, a licensed professional counselor with extensive
experience counseling sexual-abuse victims, testified that J.B. had been referred to her for
help in resolving certain psychological issues attendant to the sexual assault. So long as
J.B.'s out-of-court statement to Volet implicating the appellant in the sexual assault
otherwise satisfies the two-part test of Iron Shell/Renville, we do not think that it should be
inadmissible simply because Volet is not a psychiatrist or otherwise a member of the medical
profession. However, we do not think that the State, as proponent of the hearsay evidence,
has ultimately met its burden in demonstrating that J.B.'s out-of-court statements to Volet
identifying the appellant as the perpetrator of her sexual assault do satisfy the Iron
Shell/Renville test.

Made for Purposes of Diagnosis or Treatment?

 We agree with the Austin Court of Appeals that, consistent with the rationale for
admitting statements made for purposes of medical diagnosis or treatment over a hearsay
objection, it is appropriate to require the proponent of the evidence to show that the out-of-court declarant was aware that the statements were made for that purpose and that "proper
diagnosis or treatment depends upon the veracity of such statements." (92) This is the first part
of the Iron Shell/Renville test. Absent such an awareness on the declarant's part, we cannot
be sure that the self-interested motive to tell the truth, making such statements sufficiently
trustworthy to overcome a hearsay objection, is present.

 We disagree with the Austin Court, however, to the extent that it has held that such
a self-interested motive "is no longer present once a diagnosis has been made and treatment
has begun." (93) This is too categorical. It is inconsistent with the plain language of the rule,
which admits hearsay made for the purpose of "diagnosis or treatment," not "diagnosis or
determining a course of treatment," or "diagnosis or devising a treatment plan." Moreover,
the motive for self-preservation that fuels the hearsay exception does not necessarily
extinguish once a course of treatment has been determined and has commenced. The
effectiveness of on-going treatment, and especially of mental-health treatment, we have no
doubt, will at least sometimes depend, in some particulars, upon the patient's veracity. When
that is the case, and so long as the patient can be made to understand that dependency, there
is little reason to question his motive to be truthful in the interest of improving his own
mental health. (94)

 Still, we recognize that reclining on a therapist's or psychiatrist's couch is not quite
the same as sitting in the emergency room in the immediate aftermath of an injury or on the
physician's cold examination table in the interest of diagnosing and curing some exigent
disease or ailment. In the latter contexts, it seems only natural to presume that adults, and
even children of a sufficient age or apparent maturity, will have an implicit awareness that
the doctor's questions are designed to elicit accurate information and that veracity will serve
their best interest. This explains the almost universal tendency of courts under these
circumstances to assay the record, not for evidence of such an awareness, but for any
evidence that would negate such an awareness, even while recognizing that the burden is on
the proponent of the hearsay to show that the Rule 803(4) exception applies. (95)

 In the therapist's office, however, this tacit presumption is far less compelling. It is
not always so readily apparent (indeed, it may not always be accurate) in the mental-health
context that truth-telling is vital. Not even an older, more mature child (maybe not even an
adult) will necessarily recognize and appreciate the necessity (assuming there is a necessity)
always to tell a mental-health provider the truth in order to assure the efficacy of treatment. (96) 
In this context we think it is incumbent upon the proponent of the hearsay exception to make
the record reflect both 1) that truth-telling was a vital component of the particular course of
therapy or treatment involved, and 2) that it is readily apparent that the child-declarant was
aware that this was the case. Otherwise, the justification for admitting the out-of-court
statement over a valid hearsay objection is simply too tenuous.

Pertinent to Diagnosis or Treatment?

 The Austin Court of Appeals was also correct to say that not every statement made
in the course of mental-health treatment will be admissible just because they are likely to be
truthful. (97) By the express terms of Rule 803(4), as elaborated by the second part of the Iron
Shell/Renville test, the proponent of hearsay evidence must show that the particular statement
proffered is also "pertinent to . . . treatment," (98)--that is to say, that it was reasonable for the
therapist to rely on the particular information contained in the statement in treating the
declarant. (99) This includes showing that a statement from a child-declarant revealing the
identity of the perpetrator of sexual abuse is pertinent. In Renville, the Eighth Circuit made
it clear that this information might be pertinent because it is important for a physician to
discover the extent of the child's "emotional and psychological injuries"--particularly when
the perpetrator might be a family or household member and it is important to remove the
child from the abusive environment. (100)

 It is far less obvious how that information will necessarily be pertinent, long after the
fact of the abuse, in an on-going course of mental-health treatment or therapy. At that point,
knowing who is at fault for the emotional or psychological trauma may not be critical to
every treatment plan, especially if the perpetrator was not a family or household member. 
We think it is appropriate, therefore, to require that the proponent of the hearsay exception
make the record reflect that it was important to the efficacy of the treatment that the mental-health professional know the identity of the perpetrator. Moreover, returning to the first part
of the Iron Shell/Renville test, we also think it is appropriate, at least in the context of long-term, on-going, after-the-fact mental-health treatment, that the proponent should make it
readily apparent on the record 1) that it was important to the efficacy of the treatment (if, in
fact, it was important) for the child-declarant to disclose the true identity of the perpetrator
and 2) that the child, prior to the disclosure, understood that importance. (101) In this way we
avoid the categorical approach adopted by the Austin Court of Appeals in this context, but
are still assured that the rationale underlying the Rule 803(4) hearsay exception will be
vindicated.

Conclusion

 Volet testified that she was counseling J.B. to help her deal with the psychological
aftermath of "the rape and the sexual assault." She was also attempting to help J.B. cope
with the anger she felt towards her mother and not let that anger adversely affect her behavior
and judgment. The appellant was not a family or household member--he was, in fact, barely
more than a stranger to J.B. It is not readily apparent that knowing the appellant's identity
was pertinent to Volet's treatment of J.B. for the trauma of the sexual assault, and it seems
unlikely to have aided Volet in any material way in treating the residual anger issues that J.B.
had with her mother. This is not to say that Volet could not have testified to establish that
appellant's identity was pertinent to J.B.'s treatment in a way that is not obvious to us. But
she was never asked to do so during her testimony, and it is not otherwise apparent on the
record how it might be pertinent. Moreover, there is nothing in this record that makes it
readily apparent that J.B. understood that truthfulness about the identity of her assailant was
important to the efficacy of her treatment for these issues. We cannot presume these
predicate facts without effectively relieving the proponent of the hearsay evidence (here, the
State) of its burden to establish the existence of a valid exception to the hearsay rule. On this
state of the record, we conclude that the trial court abused its discretion to admit Volet's
testimony of J.B.'s out-of-court declarations, at least to the extent that they identified the
appellant as the perpetrator.

HARM ANALYSIS

 Ordinarily, having found error for the first time in a petition for discretionary review,
we would remand a case to the lower appellate court to conduct a harm analysis in the first
instance. But this is not an absolute rule. (102) In his concurring opinion below, Justice
Jennings expressed the view that the trial court erred in admitting Volet's testimony, but that
the error was harmless. (103) The parties have briefed the question of harm in this Court, and
we think that Justice Jennings's conclusion that the error was harmless is sufficiently clear-cut on the instant record that it would constitute a needless expenditure of judicial resources
to remand the cause.

 The error here is not of constitutional dimension. The appropriate harm analysis is
therefore the one set out in Rule 44.2(b) of the Texas Rules of Appellate Procedure, which
dictates that a non-constitutional error "that does not affect substantial rights must be
disregarded." (104) We have construed this to mean that an error is reversible only when it has
a substantial and injurious effect or influence in determining the jury's verdict. (105) We should
not overturn the conviction if we have fair assurance from an examination of the record as
a whole that the error did not influence the jury, or had but slight effect. (106) Here we believe
the error in allowing Volet's testimony would have had but slight effect.

 The appellant argues that Volet's testimony would have influenced the jury because
it provided the only corroboration for J.B.'s testimony implicating him, and the prosecutor
emphasized this fact during his final summation at the guilt phase. The prosecutor argued:

 Let's talk about the factors that weigh in favor of [J.B.'s] credibility.


 One, just the story she told you from the stand itself. Very detailed. 
Very long. And she has told this story over and over again when she was
interviewed at the Children's Assessment Center in Fort Bend County, to CPS,
to law enforcement, to her therapist. Every opportunity to get tripped up in a
lie. If she had changed that story you would have heard about it. She would
have been impeached with it. She was not. The reason that 13 year old child
was able to get on that stand and talk about those events so matter of factly like
she did is because truth is easier to tell. Lies are difficult . . .


* * *


 You heard from her therapist. She has been seeing a therapist for
months now to deal with the post traumatic stress disorder. She shows the
signs and symptoms of a child who has been sexually abused . . .


* * *


 Now, her therapist says she shows all the signs. She was consistent
with her therapist about what happened . . .


With respect to this final argument, Justice Jennings observed:


 The State, in arguing about "the factors that weigh[ed] in favor" of the
complainant's credibility, did mention that the jury "heard from" the
complainant's therapist and that the complainant had not changed her "story." 
However, the State explained that the complainant told her version of events
"over and over again" to different agencies, "law enforcement," and the jury
itself. The State's point was that if the complainant had changed her story, the
jury would have "heard about it" and her testimony would "have been
impeached." Moreover, the State also argued that Volet testified that the
complainant showed "the signs and symptoms of a child who has been
sexually abused," and this evidence is generally admissible if supported by
reliable expert testimony. See Hernandez v. State, 53 S.W.3d 742, 751 (Tex.
App.--Houston [1st Dist.] 2001, pet. ref'd). (107)


On the basis of these observations, Justice Jennings concluded that the trial court's error in
admitting the objectionable portion of Volet's testimony did not have a substantial and
injurious effect or influence on the jury in reaching its verdict. We agree that the error 
would have had but slight effect, and on that basis we hold that the error was harmless.

 Accordingly, we affirm the judgment of the court of appeals.


Delivered: October 29, 2008

Publish
1. See Tex. Penal Code § 22.021(a)(1)(B)(i) & (a)(2)(B) ("A person commits an offense . .
. if the person . . . causes the penetration of the . . . sexual organ of a child by any means . . . and .
. . the victim is younger than 14 years of age[.]").
2. Taylor v. State, ___ S.W.3d ___, 2007 WL 2214859 (Tex. App.--Houston [1st], delivered
August 2, 2007). See Tex. R. Evid. 803(4). In a separate concurring opinion, Justice Jennings
disagreed that the counselor's testimony fit the exception under Rule 803(4), but he believed that the
error in admitting that testimony was harmless.
3. Tex. R. App. P. Rule 66.3 (d), (e).
4. Uncle Lazy turned up later, unharmed.
5. J.B. testified that at this point she was "needing for it," because she had been using cocaine
"for practically every day that month" while in the company of her mother, including earlier that
evening. "I was like I know when I do coke I'm okay. So I did it. I did a couple of lines. He did
a couple of lines." On cross-examination J.B. admitted that she used cocaine, marijuana and Xanax.
6. When she was ten years old, J.B. had apparently cut herself on an unspecified number of
occasions. Uncle Lazy had given her marijuana and Xanax in an effort to calm her down.
7. The trial occurred in December of 2005, some eight or nine months after the assault.
8. The appellant argues that they are not, and that the record therefore fails to establish that J.B.
was receiving counseling from Volet for PTSD. The court of appeals did not address this contention. 
In view of our ultimate disposition, we need not resolve this ambiguity in the record.
9. Volet was not asked to identify the initial therapist whom J.B. saw. It is conceivable that
this initial therapist was the "Denise Fuller" whom J.B. named in her direct testimony. This seems
unlikely, however, given that she identified "Denise Fuller" as the therapist whom she was "still
seeing . . . to this day[.]" 
10. The indictment alleges that the sexual assault occurred on or about May 27, 2005. But from
J.B.'s testimony it is apparent that the offense must have occurred sometime in the latter part of
March or early part of April, not in May, of 2005.
11. The appellant objected to this latter testimony as well, but did not complain of the trial
court's ruling overruling his objection on direct appeal.
12. The only other witness was a Houston police officer who testified that, in May of 2005, she
showed J.B. a photo spread to see whether J.B. could identify the perpetrator, and J.B. made a
positive identification of the appellant's photograph.
13. Taylor v. State, supra, at *5.
14. Id. at *4-*5. See, e.g., Wilder v. State, 111 S.W.3d 249 (Tex. App.--Texarkana 2003, pet.
ref'd); Puderbaugh v. State, 31 S.W.3d 683 (Tex. App.--Beaumont 2000, pet. ref'd); Gohring v.
State, 967 S.W.2d 459 (Tex. App.--Beaumont 1998, no pet.); United States v. Kappell, 418 F.3d
550 (6th Cir. 2005).
15. Id. at *5.
16. Id.
17. Id. at *8-*11.
18. Perez v. State, 113 S.W.3d 819 (Tex. App.--Austin 2003, pet. ref'd); Moore v. State, 82
S.W.3d 399 (Tex. App.--Austin 2002, pet. ref'd).
19. Taylor v. State, supra, at *8-*9. Justice Jennings concluded that "[t]he rationale behind the
hearsay exception for statements made for purposes of 'medical diagnosis or treatment' regarding
a patient's physical condition simply has nothing to do with mental processes and behavior or the
providing of guidance and advice by a counselor." Id. at *9. 
20. Id. at *9. Quoting from the Austin court's opinion in Perez v. State, supra, at 830, which
in turn quotes Jones v. State, 92 S.W.3d 619, 623 (Tex. App.--Austin 2002, no pet.), Justice
Jennings observed:


 "Rule 803(4) is premised on the patient's selfish motive in receiving appropriate
treatment." This motive is no longer present once a diagnosis has been made and
treatment has begun. The details a patient may report during an extended course of
treatment may be prompted by other motives, such as denial or deception, or be
influenced by the treatment process itself.
21. Id. at *10-*11.
22. Tex. R. App. P. 66.3 (a), (e).
23. Tex. R. Evid. 802.
24. E.g., Martinzez v. State, 178 S.W.3d 806, 815 (Tex. Crim. App. 2005); Cofield v. State, 891
S.W.2d 952, 954 (Tex. Crim. App. 1994).
25. Tex. R. Evid. 803 (4).
26. 

 Zuliani v. State, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).
27. See Fed. R. Evid. 803(4).
28. E.g., Coffin v. State, 885 S.W.2d 140, 147 n.4 (Tex. Crim. App. 1994) ("Cases and
commentaries interpreting the Federal Rules of Evidence are instructive in our construction of
similarly worded provisions in our own rules.").
29. A high proportion of the relevant federal cases involve prosecutions for crimes committed
by or against Native Americans on Indian reservations, over which the federal courts have exclusive
jurisdiction. See 18 U.S.C. § 1153. For this reason, many of the cases construing Federal Rule
803(4) have arisen in the Eighth and Tenth Circuits.
30. 633 F.2d 77 (8th Cir. 1980).
31. Id. at 81-82.
32. Id. at 83.
33. Id.
34. Id. at 83-84. The United States Supreme Court has observed that "a statement made in the
course of procuring medical services, where the declarant knows that a false statement may cause
misdiagnosis or mistreatment, carries special guarantees of credibility that a trier of fact may not
think replicated by courtroom testimony." White v. Illinois, 502 U.S. 346, 356 (1992).
35. Id. at 84.
36. Id. at 84-85.
37. Fed. R. Evid. 803 (4) advisory committee notes ("Statements as to fault would not ordinarily
qualify [as a statement for purposes of diagnosis or treatment]. Thus, a patient's statement that he
was struck by an automobile would qualify, but not his statement that the car was driven through a
red light.").
38. 633 F.2d at 84.
39. 779 F.2d 430 (8th Cir. 1985).
40. 779 F.2d at 436.
41. Id. at 437.
42. Id.
43. Id. at 438.
44. Id.
45. Id. at 438-39.
46. Id. at 438.
47. Id. at 439.
48. 811 F.2d 436 (8th Cir. 1987).
49. Id. at 438.
50. United States v. Balfany, 965 F.2d 575, 581 (8th Cir. 1992), citing United States v. Provost,
875 F.2d 172, 176-77 (8th Cir. 1989) and DeNoyer, supra. See also United States v. Yellow, 18 F.3d
1438, 1442 (8th Cir. 1994); United States v. Running Horse, 175 F.3d 635, 638 (8th Cir. 1999).
51. Fed. R. Evid. 803 (4) advisory committee notes ("Under the exception the statement need
not have been made to a physician. Statements to hospital attendants, ambulance drivers, or even
members of the family might be included.").
52. The Eighth Circuit did not completely lose sight of this requirement. In Ring v. Erikson, 983
F.2d 818, 820 (8th Cir. 1992), the court of appeals held that the statement of a three-year-old victim
to an examining physician was not pertinent to her diagnosis or treatment for purposes of Rule
803(4) because she was simply too young to grasp that she was talking to a doctor, and therefore
could not be assumed to possess the self-interested motive necessary to guarantee trustworthiness. 
See also United States v. White, 11 F.3d 1446, 1450 (8th Cir. 1993) (statement made by nine-year-old
declarant to social worker in an automobile did not satisfy Rule 803(4) hearsay exception where no
explanation given to child by which he could have understood that interview conducted by a medical
professional and was for purposes of medical diagnosis or treatment).
53. 164 F.3d 1096 (8th Cir. 1999).
54. Id. at 1098.
55. 237 F.3d 954 (8th Cir. 2001).
56. Id. at 958.
57. Id., quoting Oleson v. Class, supra, at 1098.
58. United States v. Beaulieu, 194 F.3d 918, 920-21 (8th Cir. 1999); United States v. Sumner,
204 F.3d 1182, 1185-86 (8th Cir. 2000); United States v. Turning Bear, 357 F.3d 730, 738-39 (8th
Cir. 2004).
59. E.g., Morgan v. Foretich, 846 F.2d 941, 949 (4th Cir. 1988) (categorically stating that "a
young child will have the same motive to make true statements for purposes of diagnosis or
treatment as an adult[,]" without inquiring whether circumstances showed that the child understood
she was even being evaluated for purposes of diagnosis or treatment, much less whether she had
been told the importance of truthfulness to the efficacy of the evaluation); United States v. Norman,
129 F.3d 1099, 1105 (10th Cir. 1997) (Rule 804(3) will apply to out-of-court statements of five-year-old victim without particularized inquiry whether child was old enough to appreciate the need to tell
the truth to evaluating physician); United States v. Pacheco, 154 F.3d 1236, 1240-41 (10th Cir. 1998)
(same); United States v. Edward J., 224 F.3d 1216, 1219-20 (10th Cir. 2000) (same). See also United
States v. Kappell, 418 F.3d 550, 557 (6th Cir. 2005) (in holding that psychologist could testify as to
three-year-old and six-year-old victims' out-of-court statements made during evaluations by licensed
psychotherapist, court of appeals observed that "[t]here is no evidence in the record-and Kappell has
not cited any-that the children were not aware of the need to be truthful in their interviews with" the
psychotherapist).
60. United States v. Joe, 8 F.3d 1488, 1494 n.5 (10th Cir. 1993). See also United States v.
Edward J., supra, at 1220 n.3 ("Because we decline to accept the Eighth Circuit's presumptions, the
government had no burden here to show the girls understood the medical importance of telling the
truth.").
61. United States v. George, 960 F.2d 97, 100 (9th Cir. 1992).
62. See Garcia v. State, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004) (out-of-court statement
to employee of battered women's shelter not admissible under Rule 803(4) because no indication
that declarant was seeking medical treatment).
63. Burns v. State, 122 S.W.3d 434, 437-39 (Tex. App.--Houston [1st] 2003, pet. ref'd).
64. Fleming v. State, 819 S.W.2d 237, 243-44, 247 (Tex. App.--Austin 1991, pet. ref'd); 
Gohring v. State, 967 S.W.2d 459, 461 (Tex. App.--Beaumont 1998, no pet.).
65. Wilder v. State, 111 S.W.3d 249, 256-57 (Tex. App.--Texarkana 2003, pet. ref'd).
66. Puderbaugh v. State, 31 S.W.3d 683, 685 (Tex. App.--Beaumont 2000, pet. ref'd); Horner
v. State, 129 S.W.3d 210, 217-220 (Tex. App.--Corpus Christi 2004, pet. ref'd). But see Gohring
v. State, supra, at 462-63.
67. See Macias v. State, 776 S.W.2d 255, 259 (Tex. App.--San Antonio 1989, pet. ref'd)
(observing that Federal Rule 803(4) "has been interpreted to allow a physician to testify to a child's
statements relevant to the external event causing an injury[,]" citing, inter alia, United States v.
Renville, supra); Tissier v. State, 792 S.W.2d 120, 125 (Tex. App.--Houston [1st] 1990, pet. ref'd)
(citing United States v. Renville, supra, for proposition that child statement identifying abuser as a
member of her household was "reasonably pertinent to treatment" and hence admissible under Rule
803(4)); Fleming v. State, supra, at 247 (same); Turner v. State, 924 S.W.2d 180, 182 (Tex.
App.--Eastland 1996, pet. ref'd) (citing Fleming, supra, and Macias, supra, for the proposition that
"[s]tatements describing abusive acts are pertinent to medical diagnosis and treatment"); Castoreno
v. State, 932 S.W.2d 597, 602 (Tex. App.--San Antonio 1996, pet. ref'd) (under Macias, supra,
Tissier, supra, and Renville, supra, "the testimony of a child's treating physician concerning the
child's statement that the defendant had caused his injuries was admissible as a hearsay exception
under Rule 803(4)). See also Mendoza v. State, 69 S.W.3d 628, 633-34 (Tex. App.--Corpus Christi
2002, pet. ref'd) (citing, inter alia, Tissier, supra, in support of holding that child's out-of-court
statement to nurse identifying defendant as her abuser was admissible under Rule 803(4); Guzman
v. State, 253 S.W.3d 306, 308-09 (Tex. App.--Waco, no pet.) (citing Tissier to hold that statement
of fourteen-year-old identifying the defendant as her abuser was "reasonably pertinent" to diagnosis
or treatment).
68. That is, first, whether the declarant's motive in making the out-of-court statement was
consistent with the rationale underlying the rule, and, second, whether a physician or other treating
professional would reasonably rely on that statement as information pertinent to diagnosis or
treatment of the declarant. 633 F.2d at 84.
69. Gohring v. State, supra, at 461; Molina v. State, 971 S.W.2d 676, 683-84 (Tex.
App.--Houston [14th] 1998, pet. ref'd); Beheler v. State, 3 S.W.3d 182, 188-89 (Tex. App.--Fort
Worth 1999, pet. ref'd); Puderbaugh v. State, supra, at 685; Wilder v. State, supra, at 256-57; 
Horner v. State, supra, at 219; Barnes v. State, 165 S.W.3d 75, 82-83 (Tex. App.--Austin 2005,
no pet.).
70. Conversely, courts of appeals in Texas have occasionally held out-of-court statements from
child-victims to be inadmissible under Rule 803(4) because there was no reason to believe that the
child would (or even could) have appreciated that the purpose of the statement was to facilitate
diagnosis or treatment. E.g., Gohring v. State, supra, at 462-63 (even assuming that investigating
Child Protective Services social worker was engaged in diagnosis or treatment of declarant (a
dubious proposition in the court's view), "it would not be reasonable" in that context "to assume the
child would be aware" of it unless explicitly told so); Powell v. State, 88 S.W.3d 794, 800 (Tex.
App.--El Paso 2002, no pet.) (3-year-old child was too young to justify "the presumption of
reliability that forms the basis for the Rule 803(4) exception" because he could not possibly
comprehend "the need to be truthful" even in the context of medical diagnosis or treatment).
71. 82 S.W.3d 399 (Tex. App.--Austin 2002, pet. ref'd).
72. Id. at 403-05.
73. Id.
74. Id. at 404.
75. Id. at 405.
76. Id. at 409-16.
77. Id. at 414.
78. 92 S.W.3d 619 (Tex. App.--Austin 2002, no pet.).
79. Id. at 623.
80. 113 S.W.3d 819 (Tex. App.--Austin 2003, no pet.).
81. Id. at 828
82. Id. at 830.
83. Id. at 827.
84. Moore v. State, supra, at 404.
85. Id.
86. Fed. R. Evid. 803(4) advisory committee notes.
87. Id.
88. This is to be distinguished from the scenario under which the declarant is a parent of a child
who relays to a medical professional for purposes of diagnosis or treatment what the child has told
him. See, e.g., Sandoval v. State, 52 S.W.3d 851, 855-57 (Tex. App.--Houston [1st] 2001, pet.
ref'd), and federal cases cited therein. Certainly parents who convey information to a doctor for
purposes of treating their child will have a compelling (albeit not wholly selfish) motive to tell the
truth. To the extent they have first-hand knowledge of, e.g., the child's medical history, there is no
reason their out-of-court statements should not be admissible under the rule. On the other hand, if
they are only relating, e.g., the cause of an injury as they themselves have been told by the child, it
is arguable that the hearsay exception should not apply. For while there is no reason to question the
truth-telling motive of the parents, the child's statement to the parents may not have been made with
the intention (or even an awareness) that it would be passed on to a medical professional for
purposes of diagnosis or treatment. Under those circumstances, the initial declarant of the hearsay-within-hearsay statement may not have shared the selfish motive essential to guarantee its
trustworthiness.
89. 779 F.2d at 437.
90. See Moore v. State, supra, at 405.
91. See American Psychiatric Association Diagnostic and Statistical Manual of
Mental Disorders (Text Revision, 4th ed. 2000) at 463.
92. Jones v. State, supra, at 623.
93. Id.
94. Again, this assumes that the declarant's mental illness or disorder does not itself impair his
ability to appreciate the need for veracity with his care-giver.
95. Even the earliest cases did not hesitate to infer such an awareness from the circumstances. 
See United States v. Iron Shell, supra, at 84 ("We find no facts in the record to indicate that [the
nine-year-old child-declarant's] motive in making these statements was other than as a patient
seeking treatment. * * * There is nothing in the content of the statements to suggest that [the child]
was responding to the doctor's questions for any reason other than promoting treatment."); United
States v. Renville, supra, at 439 ("Nothing in the record indicates that the [eleven-year-old] child's
motive in making these statements was other than as a patient responding to a physician questioning
for prospective treatment."). See also Morgan v. Foretich, supra, at 949 (categorically stating that
"a young child will have the same motive to make true statements for purposes of diagnosis or
treatment as an adult[,]" even though concurring and dissenting opinion complained that there was
"no evidence in the record that her frame of mind was comparable to a patient seeking treatment"); 
United States v. Tome, supra, at 1457 (Holloway, J., concurring and dissenting) (complaining that
there was no record showing that very young child-declarant understood that the efficacy of her
medical treatment depended upon the accuracy of the information she provided); United States v.
Norman T., supra, at 1105 ("Norman T. also fails to point to any actual evidence in this case to show
specifically this victim did not understand she was seeking medical treatment."); United States v.
Pacheco, supra, at 1241 ("Pacheco has not pointed to any actual evidence indicating that [five-year-old child-declarant] did not understand she was being examined by doctors and needed to be truthful
in her discussions with them."); United States v. Edwards, supra, at 1220 n.3 ("Edwards fails to
point to any evidence in the record tending to show the girls did not understand they were seeking
medical treatment, or the importance of being truthful when talking to a doctor."); United States v.
Kappell, supra, at 557 (even though psychotherapist had explained to children the need to be truthful
and followed protocol to make sure they understood, court of appeals nevertheless observes that
"[t]here is no evidence in the record--and Kappell has not cited any--that the children were not
aware of the need to be truthful in their interviews" with him).


 Texas cases have been equally quick to infer the requisite awareness under the circumstances. 
E.g., Gohring v. State, supra, at 463 (ordinarily it is reasonable to "assume" that child will
understand that a statement given to a "recognized health professional, such as a physician, nurse,
psychologist, or mental health therapist" will be for purpose of medical diagnosis or treatment); 
Beheler v. State, supra, at 188 ("there is no requirement that a witness expressly state that the
hearsay declarant recognized the need to be truthful in her statements for the medical exception to
apply[,]" even if that declarant is a child); Wilder v. State, supra, at 257 ("reasonable to infer" under
the circumstances that nine-year-old declarant understood her statements to therapist were for
purposes of medical treatment); Horner v. State, supra, at 220 (trial court could have found that
statement that eight-year-old child gave to "medical social worker" in same suite as diagnosing
physician "appreciated that the effectiveness of the treatment depended on the accuracy of the
information she provided"); Barnes v. State, supra, at 83 (because she was ten years old, and mature
enough "to be interviewed outside her grandmother's presence," trial court could have found that
child-declarant understood the need to be truthful in statements made to physician). 
96. In his concurring opinion, Judge Womack asks the rhetorical question whether it would be
more important in an emergency-room situation for a thirteen-year-old victim of a stabbing or a
thirteen-year-old victim of sexual abuse to tell her health care provider the truth about the identity
of the perpetrator. Obviously it would be more important for the sexual abuse victim to tell the truth. 
(Indeed, a statement about the perpetrator of the stabbing would not even be admissible under the
hearsay exception for statements made for purposes of medical diagnosis or treatment because, as
we have noted previously, statements of "fault" in that context do not ordinarily fit the exception. 
See note 37, ante.) But the relevant question is not which victim's treatment would be best
facilitated by truthful identification of the perpetrator, but whether the latter victim would be likely
to realize and understand the importance to proper diagnosis and treatment of being truthful to her
health care provider about the identity of the perpetrator.
97. Jones v. State, supra, at 623 (medical diagnosis or treatment exception does not "encompass
every statement made by a child victim of sexual abuse to a therpist").
98. Tex. R. Evid. 803(4).
99. United States v. Iron Shell, supra, at 84.
100. 779 F.2d at 438.
101. From the outset, part of the Eighth Circuit's "rigorous standard" required a showing that a
child-declarant was made aware of the importance of information about the identity of the
perpetrator. United States v. Renville, supra, at 438. While the Eighth Circuit has sometimes lost
sight of this requirement, more recent Eighth Circuit cases have acknowledged and implemented it. 
See Olesen v. Class, supra, at 1098; United States v. Gabe, supra, at 958; United States v. Turning
Bear, supra at 738. Whether this "rigorous standard" should apply to child-declarants generally in
Texas is a question not presented on the facts of this case, and we need not decide it. But, for
reasons given in the text, we do think it appropriate to apply it at least in the context of a child-declarant's long-term, on-going, after-the-fact mental-health therapy.
102. Johnston v. State, 145 S.W.3d 215, 224 (Tex. Crim. App. 2004); McDonald v. State, 179
S.W.3d 571, 579-80 (Tex. Crim. App. 2005) (Cochran, J., concurring). See also George E. Dix &
Robert O. Dawson, 43A Texas Practice: Criminal Practice and Procedure § 44.80 (2nd ed..,
Supp. 2007-2008), at 374-75.
103. Taylor v. State, supra, at *10-*11.
104. Tex. R. App. P. 44.2(b).
105. King v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997).
106. Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).
107. Taylor v. State, supra, at *11. There was no direct evidence at trial that J.B. told her story
"over and over again" to different state agencies and law enforcement, although the jury might
reasonably have inferred it. In any event, the appellant did not object to the prosecutor's final
argument on this basis. Although the appellant did object to Volet's testimony that J.B. displayed
some of the characteristics common to children who have suffered sexual abuse, the trial court
overruled the objection and the appellant did not press the matter on appeal. See note 11, ante.