**Deloris Gene POWELL, Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 08–01–00406–CR.**

Court of Appeals of Texas,
El Paso.

Oct. 3, 2002.

Rehearing Overruled Dec. 4, 2002.

April E. Smith, Mesquite, for Appellant.

William T. Hill, District Attorney of Dallas County, Dallas, for Appellee.

Before Panel No. 5 BARAJAS, C.J., LARSEN, and DON WITTIG (Sitting by Assignment), JJ.

## *OPINION*

DON WITTIG, Justice (Assigned).

Deloris Gene Powell appeals her capital murder convictions of Emmanuel Gillens, 78, as well as his wife Nellie Gillens, 73. In three issues, she challenges the legal and factual sufficiency of the evidence and the admission of alleged hearsay evidence from the child Frederick, made to his therapist. We will affirm.

## I.

The bodies of the Gillens were found by police on a Wednesday. A neighbor saw lights on and heard a banging noise from the Gillens' home, early Tuesday morning. Mr. Gillens' body had been stabbed three times plus he had some twenty incised wounds, likely defensive wounds. Mrs. Gillens suffered seven stab wounds and some defensive wounds. Thursday the body of six-year-old Corinthian, the couple's great-grandson was found wrapped in a damp bathrobe, hidden in a closet of the home. Missing from the couple's home was another great-grandson Frederick, age 3, cash from Mr. Gillens, and his truck. Police found a cigarette, which was left burning on the television of the couple's home, in a bedroom where one of the bodies was found. Mrs. Gillens did not allow smoking in the house and forensic testing showed DNA from the cigarette matched appellant's profile. On the same Tuesday as the murders, Rockwall County Sheriff's Department stopped appellant for impeding traffic, doing thirty miles per hour in a sixty five mile per hour zone. She was driving the deceased's truck and had Frederick with her. A search produced two crack pipes, cigarettes, $3,082 in various U.S. currency, and 5.1 grams of rock cocaine. Further facts will be developed as necessary in our sufficiency review.

## II.

When we review the legal sufficiency of the evidence, we review the proof in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This standard applies in both direct and circumstantial evidence cases. *Turner v. State*, 805 S.W.2d 423, 427 (Tex.

Crim.App.1991), *cert. denied*, 502 U.S. 870, 112 S.Ct. 202, 116 L.Ed.2d 162 (1991).

In determining the factual sufficiency of the elements of an offense, the reviewing court "views the evidence in a neutral light, and sets aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000) (citing *Clewis v. State*, 922 S.W.2d 126, 129 (Tex.Crim.App. 1996)). The court reviews the evidence weighed by the jury that tends to prove the existence of the elemental fact in dispute and compares it with the evidence that tends to disprove that fact. *Id.* We are authorized to disagree with the fact finder's determination. *Id.* (citing *Clewis*, 922 S.W.2d at 133). This review, however, must employ appropriate deference to prevent an appellate court from substituting its judgment for that of the fact finder, and any evaluation should not substantially intrude upon the fact finder's role as the sole judge of the weight and credibility given to witness testimony. *Jones v. State*, 944 S.W.2d 642, 648 (Tex.Crim.App. 1996). The complete and correct standard a reviewing court must follow to conduct a *Clewis* factual sufficiency review of the elements of a criminal offense, asks whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson*, 23 S.W.3d at 11.

A conviction was authorized under the evidence if the jury found: (1) appellant stabbed Mr. Gillens with the intent of killing him in the course of robbing him; (2) appellant intentionally caused the death of both Mr. and Mrs. Gillens during the same criminal transaction; or (3) appellant

stabbed Mrs. Gillens with the intention of killing her in the course of robbing Mr. Gillens. TEX. PENAL CODE ANN. § 19.03(a) and § 29.02(a) (Vernon 1994).

### III.

■ The appellant argues only a cigarette butt found on the television in the Gillens' home linked appellant to the scene. No witnesses placed appellant at the home on the Monday night or Tuesday morning in question. Appellant had previously been a renter of the Gillens and, according to the argument, could have left the unauthorized cigarette on an earlier occasion. Although appellant was arrested driving Mr. Gillens' truck, appellant again argues there is no evidence that she did not have permission. Likewise there was no evidence that Mrs. Gillens did not give permission for appellant to give three-year-old Frederick a ride in the truck. Other physical evidence at the scene did not link appellant. The knife had only the Gillens' blood. Some evidence at the scene excluded appellant and the DNA testing showed "unknown contributors." A T-shirt and gloves contained "unknown" DNA. Latex gloves at the scene likely contained skin cells of appellant, not blood. Appellant argues the gloves could have been used earlier when she helped Mrs. Gillens.

■ An alternate theory of the cash found on appellant showed she had received a $2,800 tax refund, albeit the check was cashed in February, two months before the murders. Finally, appellant argues the State failed to prove that the murders were committed while appellant committed or attempted to commit robbery. Proof of a robbery committed as an afterthought and unrelated to a murder will not support a capital murder conviction. See Moody v. State, 827 S.W.2d 875, 892 (Tex.Crim.App.1992).

The State argues that it is indeed entitled to prove its case with circumstantial evidence. See Wilson v. State, 9 S.W.3d 852, 855 (Tex.App.-Austin 2000, no pet.). We agree. Appellant no longer lived with the Gillens at the time of the murders. Although she had recently moved out, she had been staying with a friend about a mile and a half away from the home. Appellant told her friend she needed $500, but that she only had $250. The friend also testified he only saw about $100 in appellant's possession. Appellant spent the weekend before the murders driving around buying crack cocaine and getting high. Appellant also had a pair of white latex gloves in her car. The appellant told her friend John Wesley Smith, that Chad Kelly stole appellant's car and $400 cash from her.

A friend of the Gillens testified he saw the couple late Monday afternoon and witnessed a customer paying Mr. Gillens cash for landscape work. Mr. Gillens commonly kept cash at the house. The police investigation turned up no money, Mr. Gillens' truck was missing, and Frederick was gone. Appellant did not show up for work on Tuesday, the day of the murders. Appellant was stopped that day by Rockwall Sheriff's Department for impeding traffic. Appellant first identified herself as Barbara Jackson, then later as Barbara Kelly. She claimed Frederick was her six-year-old son, then changed her story twice to identify Frederick as her grandson then her nephew. A consent search produced the drugs we already noted plus over $3,000 in cash. Although much of the forensic pathology was inconclusive, several items in the Gillens' truck appellant was driving were positive for blood: white latex gloves, a jacket, garbage bags, washcloth, and a belt. The T-shirt worn by appellant had visible bloodstains, which were not pathologically connected, but the

back of the T-shirt had DNA markers of Mrs. Gillens.

Finally, the child Frederick's statements given through the therapist Karen Karr, further implicated appellant. When asked if someone hurt Frederick's great-grandparents, he referred to appellant's nick name "Honey." Frederick also demonstrated an action by appellant and stated: "She went gr-r-r-r and my grandpa fell down."

■ We may agree with appellant, that a cigarette on a television set where appellant had prior access, standing alone, might not be legally sufficient under other circumstances. Here, however, the sum total of the surrounding additional facts and incriminating circumstances warrant the jury's conclusion of guilt. *Beardsley v. State,* 738 S.W.2d 681, 685 (Tex.Crim.App. 1987). Appellant was arrested in recent possession of stolen property. In addition to having the boy Frederick with her, appellant had cash she did not have the day before, and had the truck of the murder victim. The unexplained possession of recently stolen property is a circumstance of guilt in a robbery case. *Girard v. State,* 631 S.W.2d 162, 163 (Tex.Crim.App.1982). As far as appellant's explanation of the tax refund, the jury was free to infer this money was long gone given appellant's apparent drug problem and the testimony of two witnesses who said appellant only had about $100. Further, appellant had blood and positive DNA on her T-shirt, a stash of crack cocaine, told conflicting stories about herself and the boy, knew the house, knew both the deceased, had motive, opportunity, and proximity to rob and kill the Gillens. Appellant's first two issues are overruled.

## IV.

■ In her final issue, appellant argues the trial court erred by admitting hearsay statements of the boy Frederick, through the witness Karen Karr. Karr is a child therapist working at the Dallas Children's Advocacy Center. Karr has no medical degree but rather has a master's in counseling from Dallas Baptist University. She is a licensed professional counselor in Texas for six years and had ten years prior experience in the same field. Child Protective Services referred the three-year-old Frederick to her for therapy. Over a timely hearsay objection by the defense, the trial court allowed Karr to testify that when she questioned Frederick about his grandmother and grandfather, he stated that they were dead and the person that hurt them was "Honey." Karr also testified, that the child, again in response to her questioning of what appellant did, demonstrated, "She went gr-r-r-r and my grandpa fell down." She further related Frederick wanted to "kick her [appellant's] ass," and he demonstrated aggressive signs. When he saw the color red, he was drawn to it and said, "Oooh blood" and looked afraid, according to Karr.

Appellant cites only to Tex.R. Evid. 803(4). She presents no case authority on the complex question of whether the three-year-old's account, particularly in response to questioning by Karr, were statements for the purpose of medical diagnosis or treatment. The State argues for the application of *Gohring v. State,* 967 S.W.2d 459, 461 (Tex.App.-Beaumont 1998, no pet.). *Gohring* holds: "the trial court could have reasonably determined from the evidence that Petite, as a drama therapist working under the supervision of a licensed psychologist for the purpose of providing psychological treatment, was a 'medical person.'" *Id.* *Gohring* also noted the trial court did not err in admitting this evidence under Rule 803(4) because it would be a reasonable inference that C.G., who was a

high school student, would have understood she was seeing Petite for the purpose of medical treatment in connection with the abuse, and that C.G.'s statements to Petite were made for the purpose of medical diagnosis or treatment. *Id.* Such is not the case with a three-year-old child, particularly one not shown to be able to differentiate the truth from fabrication, and one who was seen some time after the incident. *See Sneed v. State*, 955 S.W.2d 451, 456 (Tex.App.-Houston [14th Dist.] 1997, pet. ref'd) (the primary focus is the reliability of the evidence) (time to fabricate is a factor in reliability).

The State also cites *Puderbaugh v. State*, 31 S.W.3d 683, 685 (Tex.App.-Beaumont 2000, pet. ref'd). A physician referred a child to a social worker for therapy. The Beaumont court held:

> Brouwer acknowledged that in the course of treatment in counseling C.P., it had been conveyed to C.P. that the reason for seeing him was to help her with her emotional problems. Brouwer and C.P. discussed the importance of telling the truth to him, and C.P. understood the difference between telling the truth and telling a lie. Thus, the State established both the medical care component

of Brouwer's sessions with C.P. and C.P.'s awareness of the purpose of the treatment.

*Id.* In *Puderbaugh*, a case of sexual assault, we only know that C.P. was under the age of fourteen. But we also know that there was at least proof that C.P. knew she was seeing the social worker for treatment, the treatment was in a medical office, referred by a physician[1] and the therapist saw C.P. over 30 times. *Id.*[2]

■ To be admissible under Rule 803(4), the statement must be reasonably pertinent to diagnosis or treatment. For example, statements as to fault would not ordinarily qualify. *Fleming v. State*, 819 S.W.2d 237, 247 (Tex.App.-Austin 1991, pet. ref'd). Therefore, "a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light." *Id.; see also* FED.R.EVID. 803(4) advisory committee's note. Like *Fleming*, no specific inquiry was made of Frederick whether he appreciated the need to be truthful in his statements. Unlike *Fleming*, the record does not remotely address whether Frederick was confused,[3] whether he was encouraged to tell the truth, whether he

---

1. We should note that Texas law has significant restraints against the unauthorized practice of medicine. "A person may not practice medicine in this state unless the person holds a license issued under this subtitle." TEX OCC.CODE ANN. § 155.001 (Vernon Supp.2002). " 'Practicing medicine' means the diagnosis, treatment, or offer to treat a mental or physical disease or disorder or a physical deformity or injury by any system or method, or the attempt to effect cures of those conditions. . . ." *Id.* at § 151.002(a)(13).

2. *See also Moyer v. State*, 948 S.W.2d 525, 527–28 (Tex.App.-Fort Worth 1997, pet. ref'd) (finding trial court did not err in concluding that statements made by patient to paramedic were admissible under Rule 803(4)); *Macias v. State*, 776 S.W.2d 255, 258–59 (Tex.App.-

San Antonio 1989, pet. ref'd) (finding that statements by a psychologist "were admissible under" Rule 803(4) because they "were made for the purpose of medical diagnosis and treatment," and allowing statements by the victim's mother under the same rule); *Torres v. State*, 807 S.W.2d 884, 886–87 (Tex. App.-Corpus Christi 1991, pet. ref'd) (finding emergency room nurse could testify as to victim's statement under Rule 803(4) even though nurse was also collecting evidence); *Gregory v. State*, 56 S.W.3d 164, 184 (Tex. App.-Houston [14th Dist.] 2001, pet. granted) (Wittig, J., dissenting) (allowing nurse to testify as expert and recite history by patient).

3. When appellant was stopped by Rockwall deputies and arrested, the boy was said to be incoherent.

was honest, whether he was parroting another, or coached on the "issues" by anyone. *See Fleming,* 819 S.W.2d at 247. Rather, in her sparse 13 pages of testimony, Karr only stated her minimal qualifications, her need to find out what Frederick's trauma was, who caused it, and what he saw and said. The only modality mentioned by Karr was "play therapy." Frederick, in addition to answering direct questions about the trauma, spoke of Superman and Batman.

■ We hold there is an abuse of discretion to admit the out-of-court hearsay statements of this three-year-old, where there is no evidence Frederick understood he was seeing Karr for the purpose of medical treatment and that his statements were for the purposes of treatment of his "trauma." *Gohring,* 967 S.W.2d at 461; *Metts v. State,* 22 S.W.3d 544, 550 (Tex. App.-Fort Worth 2000, pet. ref'd) (review of trial court's evidentiary rulings is under an abuse of discretion standard). Absent indicia of reliability sufficient to ensure the integrity of the fact finding process, such evidence should be excluded. *Philpot v. State,* 897 S.W.2d 848, 852 (Tex.App.-Dallas 1995, pet. ref'd). When young children relate information to medical providers, the presumption of reliability that forms the basis for the Rule 803(4) exception may break down if the child does not understand the need to be truthful. *Beheler v. State,* 3 S.W.3d 182, 189 (Tex.App.-Fort Worth 1999, pet. ref'd). The reviewing court must look to the record to see if it supports a conclusion that the young child understood why he needed to be honest when speaking to the care giver. *Id.* The record discloses neither Freder-

ick's understanding the reason for his treatment nor his need to be honest.

■ Next we turn to the harm analysis. Error in the admission of evidence is subject to a harm analysis under Rule 44.2(b) of the Rules of Appellate Procedure. *Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998). A violation of the evidentiary rules that results in the erroneous admission of evidence is nonconstitutional error. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App.1997).[4] Any nonconstitutional error "that does not affect substantial rights must be disregarded." Tex.R.App. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *See King,* 953 S.W.2d at 271. A criminal conviction should not be overturned for nonconstitutional error if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but slight effect. *Johnson,* 967 S.W.2d at 417. When applying the harmless error rule, a reviewing court should not focus on the propriety of the outcome of the trial. Instead, it should be concerned with the integrity of the process leading to the conviction. *Harris v. State,* 790 S.W.2d 568, 587 (Tex.Crim.App.1989). Among the factors to be considered are: the source of the error; the nature of the error; whether and to what extent the error was emphasized by the State; the collateral implications of the error; how much weight a juror would probably place upon the error; and whether declaring the error harmless

---

**4.** Appellant made no objection under the confrontation clause. Hearsay statements used against a defendant over his objection could violate the confrontation clause if they were not admitted under a well-recognized exception to the hearsay rule or the court failed to

make a finding that the statements were otherwise reliable. *See Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 3147, 111 L.Ed.2d 638 (1990); *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).

would encourage the State to repeat it with impunity. *Id.*

Frederick's hearsay statement via Karr about his association of red paint and blood, could hardly be surprising for a three-year-old. Likewise, the "gr-r-r-r" statement, in light of his predilection toward Batman and Superman, seem hardly persuasive. However, his statement, via Karr, that "Honey" hurt his grandfather and grandmother, is powerful, if only emotionally. The prosecution did argue briefly Frederick's hearsay, but mainly relied upon the many circumstances that connected appellant to the murders. Given the defense did not even bother to cross-examine the very brief testimony of Karr, they certainly seemed to view it as not that effective. Karr had little expertise, and only mentioned play therapy as her means of ascertaining the cause of Frederick's trauma. Rockwall police had already testified that when appellant was arrested the day of the murders, the child was incoherent. The strong circumstantial evidence of appellant's access to the home, her proximity, her drug use, her cigarette in one of the murder rooms, and being arrested the day of the murders with the victim's truck, his money, and his grandson, would, we believe, be much more reliable and weighty to most juries than the hearsay of a three-year-old. Nor do we believe the State would likely repeat this error, which is hopefully limited to this unique case. In light of the totality of the record, we hold the error to be harmless under the non-constitutional standard. *Id.* Appellant's third issue is overruled.

The judgment of the trial court is affirmed.