

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| STEVE ENRIQUE QUINTERO RIOS, | § | No. 08-17-00045-CR |
| Appellant, | § | Appeal from |
| v. | § | 384th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC # 20150D04760) |
|  | § |  |

## O P I N I O N

A jury found Appellant Steve Enrique Quintero Rios guilty of the murder of his wife, Brenda Rivera, who died as the result of a single gunshot wound, and sentenced him to 65 years in prison.

Appellant raises the following three issues on appeal: (1) whether his trial attorney was ineffective for failing to obtain a ruling on his pretrial motion to suppress evidence; (2) whether the trial court erred by allowing the State to refresh the recollection of three of its witnesses at trial with their prior statements to police and/or by allowing the witnesses to read from their prior statements; and (3) whether the trial court erred by admitting a recording of a 911 call made by a neighbor after she witnessed Appellant and Rivera in a physical altercation shortly before the shooting occurred.

We affirm.

**FACTUAL BACKGROUND**

Appellant and Rivera were married in February of 2014, and lived with Rivera's then eight-year-old daughter, A.R. At trial, Appellant acknowledged that his marriage to Rivera was fraught with family violence from the start, with both parties being physically abusive toward each other. Appellant further acknowledged that he and Rivera were involved in a violent fight on the night of Rivera's death. Appellant, however, disagreed with the State's theory that he intentionally shot his wife during the fight, and instead claimed that her shooting was accidental.

**The Events Leading Up to the Shooting**

On the evening of July 30, 2015, Rivera was in the couple's front yard, conversing with two neighbors, Maria Cheung, and Maria's then 19-year-old daughter, Felicia Cheung. Rivera informed the Cheungs that she was upset with Appellant, as he was late arriving home from work and was driving the couple's only car, a Cobra Mustang, which she needed to pick up a friend at the airport. When Appellant arrived home, he was followed by a co-worker, Jonathan Roa, who parked his car on the street to wait for Appellant, as the two intended to go out later. Appellant parked his car in the garage, and he and Rivera he went inside the house, leaving the garage door open. The Cheungs also went inside their home located across the street. Shortly thereafter, Maria Cheung's then fourteen-year-old granddaughter, May-Sum Medina, observed Appellant and Rivera fighting in the garage, and called out to Maria and Felicia to alert them to the fight. Maria and Felicia both went outside, and all three witnesses observed a violent encounter between the couple. May-Sum testified at trial that she saw Rivera hit Appellant once or twice with a small wooden bat, and then hit the couple's car with the same bat.[1] Maria recalled that she also saw

---

[1] The bat was later determined to be a wooden rolling pin.

Rivera hit the car with the bat, and became concerned, in part because she knew how much Appellant loved the car. May-Sum, Maria and Felicia all recalled that Appellant thereafter put Rivera in a "headlock" with one arm, while hitting Rivera in the face with his other arm. All three recalled seeing Appellant thereafter grab Rivera by the hair and drag her inside the house, closing the garage door behind him. Felicia called 911 to report the fight, and the Cheungs waited for the police to arrive.

Roa testified that he did not see the fight in the garage in part because he had a limited view of the garage from where he was parked. At some point, however, Roa went inside the home to use the restroom, and observed the couple arguing. Roa recalled that while he was in the restroom, he heard loud banging noises coming from the laundry room and heard Rivera say: "Get off me." He then heard Appellant say: "I'm going to pop a cap in her."[2] When Roa exited the restroom, he saw Appellant on top of Rivera in the laundry room, holding her by the shoulders, and he believed that Rivera was being "strangled down, forcefully," was in distress, and was having difficulty breathing. However, because he believed Rivera told him to leave, Roa left the house to wait for Appellant in his car. Before leaving, Roa encountered A.R., and advised her to lock herself in her bedroom to be safe.

A.R. testified that she also observed Appellant and Rivera fighting in the garage that night, and recalled seeing Appellant go inside the house during the fight to retrieve a gun. She recalled that Appellant returned to the garage and pointed the gun at Rivera's head as he dragged her by the hair from the garage into the house through the laundry room. A.R. testified that while inside

---

[2] Although Roa did not clarify at trial what he thought Appellant meant by that phrase, he told police the night of the shooting that he also heard Appellant say he was going to get his gun while the couple was fighting inside the house; however, at trial, Roa testified that he did not recall making that statement, and he further denied seeing Appellant with a gun at any time that night.

3

the house, she heard Appellant tell Roa to leave, as he intended to shoot Rivera. A.R. recalled that although she tried to intervene, Appellant yelled at her to go to her bedroom. A.R. thereafter observed Appellant force Rivera into the couple's master bedroom, where the fight continued. A.R. recalled that she heard yelling and banging noises coming from the bedroom, and ultimately heard a gunshot.

Roa testified that approximately ten minutes after he left the house, he called Appellant on his cell phone, and was told by Appellant that Rivera had shot herself during their fight. Roa then returned to the house, and observed Rivera's body on the floor in the couple's bedroom, with a gun in her left hand. At Roa's urging, Appellant called 911, and Roa heard Appellant tell the 911 operator that Rivera had committed suicide.

When police arrived at the scene, they found Rivera unresponsive on the bedroom floor, with a gun clutched in her left hand and Appellant sobbing over her body. Appellant told first responders that he and Rivera had been in a fight over "jealousy" issues, and that Rivera had pointed the gun at her head and committed suicide. Although the gun was found in Rivera's left hand, Appellant admitted to first responders and later to detectives at the police station, that Rivera was right-handed.

### Appellant's Recorded Interview

After taking statements from the witnesses at the scene, the police transported Appellant to police headquarters where a recorded interview took place the next morning. After voluntarily waiving his *Miranda* rights, Appellant informed police that he and Rivera had a history of family violence, with both of them being physically abusive to each other, and that Rivera, who was in the military, had guns in the house, which she had previously taken out during their fights.

4

Appellant stated that he and Rivera had been fighting the night of the shooting, in part because he had arrived home late from work and she needed their car to pick up her friend. Appellant further acknowledged that the fight had turned physically violent, with he and Rivera hitting and punching each other. Appellant stated that they ultimately ended up in their master bedroom where Rivera took a gun from the nightstand and began waving it around in a threatening manner. Appellant initially advised police that he tried to calm Rivera down and take the gun away from her, but she became exceedingly distraught and ultimately shot herself.

Later in the interview, however, Appellant changed his story and stated that the gun went off accidentally while he was trying to take it away from Rivera. Appellant admitted that he thereafter placed the gun in Rivera's left hand to make it appear that she had committed suicide, as he was afraid the police would not believe the shooting was accidental. He further acknowledged that he may have accidentally squeezed the trigger during the struggle, but repeatedly professed that the shooting was not intentional.

Following the interview, Appellant was arrested and charged with Rivera's murder.

**The Autopsy Findings and the Forensic Evidence**

A subsequent autopsy on Rivera's body revealed that she died of a single gunshot wound to her head, and that she also suffered several other blunt force injuries to her body that were inflicted prior to her death. The medical examiner testified that he observed stippling around the sight of the gunshot wound, which indicated the gun had been fired from an "intermediate" range, which is typically between three and thirty inches; however, he believed that in this particular instance, the gun had been fired from a distance of approximately 15 inches. Based on his findings, the medical examiner concluded that the cause of Rivera's death was homicide.

5

The State also presented evidence at trial that Appellant had gunshot primer residue particles on his hands at the time of his arrest, which was indicative of his hands being in immediate proximity of a weapon as it was being fired. In addition, the police found a single fingerprint belonging to Appellant on a gun case in the couple's house.

## DISCUSSION

### ISSUE ONE: INEFFECTIVE ASSISTANCE OF COUNSEL

In Issue One, Appellant contends that he was deprived of his constitutional right to the effective assistance of counsel and ultimately of his right to a fair trial, because his trial attorney failed to obtain a ruling on a motion to suppress evidence that he had filed prior to trial.

### *Standard of Review and Applicable Law*

A defendant has a Sixth Amendment right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Frias,* 511 S.W.3d 797, 809 (Tex.App.--El Paso 2016, pet. ref'd). To prevail on a claim of ineffective assistance of counsel, a defendant must establish by a preponderance of evidence that: (1) his attorney's performance was deficient; and (2) his attorney's deficient performance deprived him of a fair trial. *Strickland*, 466 U.S. at 687; *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex.Crim.App. 2005); *Frias*, 511 S.W.3d at 809. The burden is on the defendant to satisfy both prongs of the *Strickland* test, and his failure to satisfy either prong will defeat the claim. *See Perez v. State*, 310 S.W.3d 890, 893 (Tex.Crim.App. 2010); *see also Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex.Crim.App. 2003).

Under the first prong of the *Strickland* test, an attorney's performance is considered deficient when it falls "'below an objective standard of reasonableness' under prevailing professional norms and according to the necessity of the case." *Frias*, 511 S.W. 3d at 809, *quoting*

6

*Ex Parte Moore,* 395 S.W.3d 152, 156-57 (Tex.Crim.App. 2013); *see also Mitchell v. State*, 68 S.W.3d 640, 642 (Tex.Crim.App. 2002). To sustain a claim that his trial counsel's actions fell below this standard, a defendant must establish that counsel's acts or omissions were not the result of reasonable professional judgment or sound trial strategy. *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex.Crim.App. 2013); *Frias*, 511 S.W. 3d at 809. When the record is silent as to trial counsel's strategy, a court must generally "assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it." *Okonkwo,* 398 S.W.3d at 693-94, *quoting Andrews v. State,* 159 S.W.3d 98, 101 (Tex.Crim.App.2005). Therefore, a direct appeal is usually an inadequate vehicle for raising an ineffective assistance of counsel claim because the record is generally undeveloped as to why trial counsel did what he or she did, making it difficult in most instances to determine if counsel's performance was deficient or not. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex.Crim.App. 2005); *see also Rylander*, 101 S.W.3d at 110-11 (noting that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective").

Under the second prong of the *Strickland* test, a defendant must establish that there is a reasonable probability that but for his attorney's deficient performance, the outcome of his case would have been different. *See Strickland*, 466 U.S. at 694; *see also Miller v. State,* 548 S.W.3d 497, 499 (Tex.Crim.App. 2018); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App. 1999). In other words, the reviewing court must determine whether there is a reasonable probability that, absent the errors in the attorney's performance, the "factfinder would have had a reasonable doubt respecting guilt." *Miller*, 548 S.W.3d at 499. This determination requires the reviewing court to

7

examine "the totality of the evidence before the judge or jury," and ask whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Miller*, 548 S.W.3d at 499, *citing Strickland,* 466 U.S. at 695-96. Because judicial proceedings are presumed to be reliable, a defendant shoulders the difficult burden of overcoming that presumption and of demonstrating how the "specific errors" of his attorney's performance undermined the "finding of guilt or the punishment assessed." *Miller,* 548 S.W.3d at 513, *citing Roe v. Flores-Ortega*, 528 U.S. 470, 482 (2000).

### *Appellant's Motion to Suppress*

In his motion to suppress, Appellant's sought to suppress all evidence that was derived from a forensic examination that was conducted on his cell phone after the police obtained a search warrant to seize the phone following his arrest. In the motion, Appellant argued that the police did not have probable cause to conduct the forensic examination, nor did they have Appellant's consent to do so.[3] At the hearing on the motion, the trial court asked defense counsel several times to provide it with additional legal authorities to support his arguments. Although defense counsel agreed to do so, he failed to provide the trial court with any additional authorities and further failed to obtain a ruling on the motion. Appellant now claims that these failures deprived him of his right to effective assistance of counsel.

As Appellant acknowledges, however, that the mere failure of an attorney to obtain a ruling on a motion to suppress is not, standing alone, sufficient to establish that the attorney was

---

[3] During his police interview, Appellant encouraged the detectives to look at the text messages on his cell phone, which he and Rivera had exchanged earlier in the day, to demonstrate that everything was "just fine" between them leading up to the fight and that he had "no reason" to murder Rivera. Appellant also informed the detectives that although the couple had experienced problems in the past, he had messages on his phone demonstrating that they were trying to improve their relationship. Appellant argued in his motion that, at most, he consented to allow the police to view the messages on his phone, but did not consent to a full forensic examination of the phone.

ineffective. Instead, the defendant must establish that the result of his trial would have been different if the motion to suppress had been pursued; in other words, the defendant must establish both that the motion to suppress the evidence would have been granted, and that the remaining evidence presented at trial would have been insufficient to support his conviction. *See e.g. Jackson v. State,* 973 S.W.2d 954, 957 (Tex.Crim.App. 1998); *see also Roberson v. State,* 852 S.W.2d 508, 510-12 (Tex.Crim.App. 1993)(unless there is a showing that a pre-trial motion had merit and that a ruling on the motion would have changed the outcome of the case, counsel will not be ineffective for failing to assert the motion). We need not, however, resolve the question of whether the trial court would have granted Appellant's motion to suppress the evidence of the forensic examination, as we conclude that even if the trial court had granted the motion, the outcome of Appellant's trial would not have been any different.

### *The Admission of the Evidence did not Affect the Jury's Verdict*

At trial, the State introduced only one item of evidence relating to the forensic examination of Appellant's cell phone, which consisted of a chart depicting the text messages that were sent and received on his phone on the day of Rivera's murder, beginning at 1:21 a.m. on July 30, 2015, and ending at 12:34 a.m. on July 31, 2015, together with a list of calls that were made to and from Appellant's phone during this same time. Appellant argues that he was prejudiced by the introduction of the chart, contending that it supported the State's theory that he and Rivera had a "history of family violence," and that Appellant intentionally murdered Rivera during their final and fatal episode of family violence. Appellant further asserts that, without the admission of the chart, the "State ha[d] little evidence to support [its] family-violence theory," thereby making its introduction highly prejudicial to his case. We reject Appellant's argument for several reasons.

First, while it is possible that the forensic examination of Appellant's cell phone may have

9

revealed that he and Rivera had a history of family violence, the chart, which was the only evidence admitted from the examination, did not reveal any such history. Instead, the messages that were displayed in the chart were nothing more than routine exchanges between Appellant and Rivera informing each other of their whereabouts on the day of the shooting and their plans for the evening. Further, rather than demonstrating that any animosity existed between the couple that day, the chart contained two separate exchanges between them in which they both expressed their love for each other and called each other affectionate names. [4]

Moreover, Appellant is incorrect when he contends that the State had little other evidence to support its position that the couple had a history of family violence. At trial, both Appellant and the State presented testimony from witnesses who had observed the couple being physically abusive to each other in the past, and Appellant himself repeatedly referred to their history of physical abuse during his recorded interview with police. In addition, in his opening statement and closing argument to the jury, Appellant's attorney emphasized the violent nature of the couple's relationship as part of Appellant's defensive theory to explain why Appellant felt threatened by Rivera's actions when she allegedly took the gun from the couple's nightstand, and why he allegedly engaged in attempts to try to calm her down and take the gun away from her. Therefore, even if the chart had contained evidence of family violence, such evidence would have been cumulative in nature, and would not have affected the outcome of Appellant's case. *See*

---

[4] Appellant finds it significant that the prosecutor referred to the chart during her closing argument, but we note that the prosecutor only did so to point out that the chart established that Appellant had been at work on the day of the shooting, in order to rebut Appellant's claim that Rivera was so controlling that she would not allow Appellant to work. The State's reliance on the chart for this purpose had no impact on Appellant's case, as the fact that Appellant was at work prior to the shooting was not in dispute and was well-established by other evidence at trial. In addition, Appellant finds it significant that the jury asked to see the chart during its deliberations. However, the reason for this request is not evident from the record, and because the chart simply set forth an undisputed timeline of the events leading up to the couple's fight, the jury's request to see the chart does not alter our conclusion that its admission had no impact on the outcome of Appellant's case.

10

*Aldaba v. State*, 382 S.W.3d 424, 433 (Tex.App.--Houston [14th Dist.] 2009, pet ref'd)(trial counsel's failure to obtain a ruling on a motion to suppress defendant's statements to police would not have affected the outcome of the defendant's case, where the statements were cumulative in nature as the defendant testified to the substance of the statements at trial); *see generally Brooks v. State*, 990 S.W.2d 278, 287 (Tex.Crim.App. 1999)(error in admitting evidence was harmless in light of other properly-admitted evidence at trial proving the same fact).

And finally, we conclude that even if the trial court had granted Appellant's motion to suppress, and the chart had not been admitted into evidence, the remaining evidence presented at his trial was more than sufficient to support the jury's verdict. As set forth above, Appellant admitted that Rivera was shot during their fight, and the only question for the jury to resolve was whether the shooting was intentional or accidental. At trial, the State presented ample evidence to support a conclusion that the shooting was intentional, including the testimony from both Roa and A.R. that they heard Appellant make statements manifesting his intent to shoot Rivera, the fact that gun residue was found on Appellant's hands at the scene of the crime, and the fact that Rivera was shot from an intermediate range, rather than from a more immediate distance, which was inconsistent with Appellant's claim that Rivera was shot accidentally while they were struggling for possession of the gun.

Accordingly, we conclude that regardless of whether Appellant's attorney was deficient in failing to obtain a ruling on the motion to suppress, Appellant cannot meet the second prong of the *Strickland* test, as there is no reasonable probability that counsel's failure to obtain a ruling on the motion affected the outcome of his trial. As such, we reject Appellant's claim that he was denied the effective assistance of counsel.

11

Appellant's Issue One is overruled.

## ISSUE TWO: REFRESHING THE WITNESSES' MEMORIES

In Issue Two, Appellant contends that the trial court erred by allowing the prosecutor to refresh the recollection of three of its witnesses at trial several instances at trial by using the prior written statements they gave to police on the night of Rivera's shooting, without first laying a proper predicate to establish the need to have their memories refreshed and/or by allowing the witnesses to read directly from their statements. We agree with the State that in most of these instances, Appellant failed to timely object to the prosecutor's use of the statements and/or to the witness's testimony, and therefore Appellant failed to preserve these issues for our review. We further conclude that any error in the use of the witnesses' prior statements at trial did not prejudice Appellant's case.

### *Applicable Law and Standard of Review*

A witness is generally required to testify from his "present recollection," or in other words, from "what he remembers presently about the facts in the case." *Welch v. State*, 576 S.W.2d 638, 641 (Tex.Crim.App. 1979). However, when a witness's present recollection fails, counsel may ask the witness to review a prior memorandum made when the witness's memory was fresh in an attempt to refresh his recollection. *Id.; see also Carrillo v. State,* 634 S.W.2d 21, 24 (Tex.App.--El Paso 1982, no pet.). Before doing so, counsel must lay a proper predicate to show that the witness is unable to recall a particular fact contained in the witness's prior written statement, and that a need therefore exists to refresh the witness's memory with the statement. *See, e.g., Welch*, 576 S.W.2d at 641; *Carrillo,* 634 S.W.2d at 24. If, after reviewing his prior statement, the witness states that his memory has been refreshed, the witness may then continue to testify on the basis of his newly-refreshed memory. *See Welch*, 576 S.W.2d at 641; *see also Wood*

12

*v. State,* 511 S.W.2d 37, 43 (Tex.Crim.App. 1974);*Carrillo*, 634 S.W. 2d at 24. However, if the witness's memory is not refreshed, he is not permitted to testify solely on the basis of the prior statement, or in other words, the witness may not simply read from the written material.[5]  *See Guerra v. State*, 676 S.W.2d 181, 183 (Tex.App.--Corpus Christi 1984, pet. ref'd); *see also Douglas v. State*, No. 05-93-01779-CR, 1995 WL 654606 at *3 (Tex.App.--Dallas Nov. 2, 1995, pet. ref'd)(not designated for publication).

In general, we review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82-83 (Tex.Crim.App. 2016). A trial court abuses its discretion only when its decision falls outside the zone of reasonable disagreement. *Id*. at 83. We will uphold the trial court's evidentiary ruling if it is correct on any theory of law applicable to the case. *Id*. at 93. However, in order to preserve error for our review, a defendant is required to make a timely and proper objection to the admission of evidence at trial stating the specific grounds for the ruling desired, and secure a ruling on that objection. *See Gibson v. State*, 541 S.W.3d 164, 166 (Tex.Crim.App. 2017), *citing* TEX.R.APP.P. 33.1(a)(1)(A); *see also Peralta v. State*, 338 S.W.3d 598, 609 (Tex.App.--El Paso 2010, no pet.). Further, the objection made at trial must comport with the complaint made on appeal, or nothing is preserved for our review. *See, e.g. Sorto v. State,* 173 S.W.3d 469, 476 (Tex.Crim.App. 2005); *Bell v. State,* 938 S.W.2d 35, 54 (Tex.Crim.App. 1996); *Rezac v. State,* 782 S.W.2d 869, 870 (Tex.Crim.App. 1990). In addition, a party must continue to object each time inadmissible evidence is offered, unless the defendant makes a running objection or requests a hearing outside the presence of the jury.

---

[5] If the witness states that his memory is not refreshed, but has identified the prior memorandum and guarantees its correctness, then the memorandum may be admitted as a past recollection recorded. *Welch*, 576 S.W.2d at 641. In the present case, however, the prosecutor did not attempt to admit any of the witnesses' prior statements for this purpose.

13

*Peralta*, 338 S.W.3d at 609, *citing Ethington v. State,* 819 S.W.2d 854, 858 (Tex.Crim.App. 1991); *Martinez v. State,* 98 S.W.3d 189, 193 (Tex.Crim.App. 2003); *see also Hudson v. State*, 675 S.W.2d 507, 511 (Tex.Crim.App. 1984)(it is well-settled that "defense counsel must object every time allegedly inadmissible evidence is offered").

### May-Sum's Testimony

Appellant complains about two separate exchanges the prosecutor had with May-Sum with regard to her observations of the fight she observed between Appellant and Rivera in the couple's garage. In the first exchange, May Sum testified that she recalled seeing Rivera hit Appellant with the bat, and then hit the couple's car. The prosecutor then asked May-Sum if she remembered telling the police anything different on the night of the shooting, and after May-Sum replied that she did not, the prosecutor asked May-Sum to review her police statement. Without any objection, May-Sum reviewed her statement, and then testified that she told police she had observed Rivera hit Appellant with the bat, but that she did not tell the police she had seen Rivera hit the car.

In the second exchange, the prosecutor asked May-Sum on direct examination what alerted her to the couple's fight in the garage, and May-Sum responded that she initially heard the couple "fighting" or "arguing" in the garage. On redirect, the prosecutor asked May-Sum to look at her police statement and "see if you remember exactly what you heard that night." Defense counsel objected that the prosecutor was asking May-Sum to testify from the statement. At the court's suggestion, the prosecutor rephrased her question, and asked May-Sum if she remembered what she heard that first alerted her to the fight, and, without objection, May-Sum testified that she heard "yelling and arguing." The prosecutor then asked May-Sum if she remembered telling the police

14

something different, and May-Sum responded that she did not. The prosecutor thereafter asked May-Sum to review her statement, and after doing so, May-Sum testified, without objection, that she told police that she had heard arguing in the garage and then heard Rivera "scream."

Appellant contends that in both instances, the trial court erred by allowing the prosecutor to use May-Sum's prior statement to refresh her recollection without first laying a proper predicate to establish that May-Sum's memory needed to be refreshed, and by permitting May-Sum to testify regarding the contents of her statement, rather than from her refreshed memory. We conclude, however, that in both instances, Appellant failed to make a timely and proper objection and therefore failed to preserve these issues for our review.

In the first instance, Appellant failed to make any objection to the prosecutor's use of May-Sum's statement or to her testimony. In the second instance, Appellant initially objected that the prosecutor was improperly asking May-Sum to testify to the contents of her statement; however, Appellant failed to renew his objection after the trial court directed the prosecutor to rephrase her question, and May-Sum was thereafter permitted to respond to the prosecutor's question without objection. Therefore, Appellant did not preserve this issue for our review. [6] *See, e.g., Hudson,* 675 S.W.2d at 511 (where prosecutor rephrased his question after defense counsel's objection was sustained, defense counsel was required to renew his objection, and his failure to do so left nothing for appellate review); *Hernandez v. State,* 825 S.W.2d 765, 772 (Tex.App.--El Paso, 1992, no pet.)(appellant was required to renew his objections to prosecutor's rephrased questions

---

[6] We also note that during both exchanges, the prosecutor asked May-Sum follow-up questions seeking to clarify what she told the police about her observations. In both instances, Appellant objected that the prosecutor was asking "leading" questions, and the trial court sustained those objections. Those objections, however, did not comport with the issue that Appellant is attempting to raise on appeal, and therefore, the objections do not preserve Appellant's complaints for our review.

in order to preserve error for appellate review).

## Jonathon Roa's Testimony

Appellant also complains about a prolonged exchange the prosecutor had with Jonathon Roa regarding what he observed while he was waiting in his car outside the couple's house before he entered the house to use the restroom. During this exchange Roa testified on direct examination that he observed Appellant and Rivera standing at their front door engaged in a "discussion" before he entered the house to use the restroom. The prosecutor then asked Roa if he recalled telling the police "something different," to which Roa responded in the negative. The prosecutor then stated: "But, sir, when you gave your statement to Detective Flores, you characterized it as fighting--." Defense counsel interrupted the prosecutor and objected that "he" was "testifying from that statement," rather than asking the witness a question. The trial court sustained the objection, but told that the prosecutor he could use Roa's police statement to refresh his recollection if needed. The prosecutor thereafter rephrased his question, and asked Roa if it would refresh his recollection to read his statement; Roa then read from his statement, without objection, and acknowledged that he told police he had seen Appellant and Rivera "fighting" inside the house, and that the couple appeared to be in a "confrontation."

The prosecutor thereafter asked Roa the following: "So I just want to be clear, Mr. Roa, when you gave the statement back in 2015, you told the detective that it appeared that they were fighting?" After Roa replied in the affirmative, defense counsel asked the trial court to "instruct him to stop testifying from the statement if his memory . . . has been refreshed." The trial court instructed defense counsel to limit his use of the statement to refreshing Roa's memory. However, the prosecutor did not ask Roa any additional follow-up questions with regard to his

16

statement.

Appellant has two complaints about this exchange. First, Appellant contends that the prosecutor did not lay a proper predicate before using Roa's prior statement to refresh his recollection regarding what he had seen inside the house. Once again, however, we note that Appellant never made this objection at trial, and therefore Appellant did not preserve this complaint for appellate review.

Second, Appellant contends that the prosecutor improperly asked Roa to read from and/or "testify" from his prior statement. While Appellant did make two objections on this basis, neither one preserves this complaint for our review. Appellant's initial objection was to the manner in which the prosecutor was questioning Roa, but after the trial court sustained his objection, the prosecutor was permitted to rephrase his question, and Appellant did not object to the rephrased question, and Roa thereafter read from his statement without objection.

In addition, although Appellant later made a second objection that Roa was again reading from his statement, this objection came after Roa had already read from his statement, and Appellant did not move to strike any of Roa's previous testimony on this subject. Accordingly, we conclude that Appellant failed to preserve this complaint for our review. *See Ethington v. State,* 819 S.W.2d 854, 858 (Tex.Crim.App. 1991)(to preserve an issue concerning the admission of evidence for appellate review, defense counsel must make a timely objection to the evidence, if possible, before it is actually admitted, and if not possible, the defendant must have objected to its admission as soon as the objectionable nature of the evidence became apparent and must have moved to strike the evidence); *Crestfield v. State*, 471 S.W.2d 50, 54 (Tex.Crim.App. 1971) (objection to chemist's testimony about the effects of being under the influence of LSD came too

17

late to preserve error where chemist gave an extensive answer to State's question concerning the effects of LSD before any objection was made).

## Felicia Cheung's Testimony

Appellant also complains about an exchange that occurred between the prosecutor and Felicia Cheung regarding whether she and Appellant had previously engaged in a conversation about "guns" prior to the night of the shooting. On direct examination, the prosecutor asked Felicia if she had previously had any such conversations with Appellant, and Felicia replied in the negative. The prosecutor then asked Felicia if she recalled telling the police anything different on the night of the shooting, to which Felicia again replied in the negative. When the prosecutor then asked if it would refresh Felicia's recollection to review her statement to the police, Appellant objected that the prosecutor was "impeaching" her own witness. After the trial court sustained the objection, the prosecutor passed the witness, without further questioning.

However, on redirect examination, the prosecutor asked Felicia to review her police statement to see if it refreshed her memory "as to whether or not [she] ever had any conversations with the defendant about guns." Defense counsel objected that the prosecutor had not demonstrated the need to use the statement to refresh Felicia's memory, but the trial court overruled his objection, and Felicia was allowed to review her statement. After doing so, Felicia testified that she recalled having a conversation with Appellant in which he informed her that someone had previously robbed his house and had taken "his gun."

Appellant argues that the prosecutor did not lay a proper predicate to establish that Felicia's memory needed to be refreshed on this point, but the record belies this argument. Felicia's testimony on direct examination in which she stated that she did not recall having a conversation

18

with Appellant about guns laid a proper predicate to demonstrate that a need existed to refresh her memory on this point. Accordingly, the trial court properly overruled Appellant's objection and properly allowed the prosecutor to use Felicia's statement to refresh her memory regarding this conversation. *See Morgan v. State,* 491 S.W.2d 903, 905 (Tex.Crim.App. 1973)(prosecutor properly used witness's prior affidavit to refresh her memory where witness testified that she could not recall a particular fact set forth therein).

### *Harmless Error Analysis*

Moreover, even if we were to overlook Appellant's failure to object to the prosecutor's use of the witnesses' prior statements, we would not find that the use of these statements constituted reversible error. In general, the erroneous admission of evidence is considered non-constitutional error which an appellate court must disregard unless it affected the defendant's substantial rights. TEX.R.APP.P. 44.2(b); *see also Motilla v. State*, 78 S.W.3d 352, 355 (Tex.Crim.App. 2002); *Powell v. State*, 88 S.W.3d 794, 800 (Tex.App--El Paso 2002, pet. struck). In turn, a defendant's substantial rights are not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *See Motilla*, 78 S.W. 3d at 355; *Powell*, 88 S.W.3d at 800. When the erroneous admission of evidence is cumulative of other properly admitted evidence proving the same fact, the erroneous admission is considered harmless. *See Brooks,* 990 S.W.2d at 287; *see also Burks v. State,* 876 S.W.2d 877, 898 (Tex.Crim.App. 1994)(erroneously admitted hearsay testimony did not harm appellant where testimony of trial witnesses proved the same facts); *Goudeau v. State*, 209 S.W.3d 713, 721 (Tex.App.--Houston [14th Dist.] 2006, no pet.)(any error in allowing officer to read from his offense report was harmless where the information that he read

19

was cumulative of his previous testimony in the case).

As explained above, the prosecutor used May-Sum's statement to point out two variances between her trial testimony and her prior statement with regard to whether she saw Rivera hit the couple's car with the bat and whether she heard Rivera scream during their fight. Similarly, the prosecutor used Roa's statement to point out a variance between his trial testimony and his prior statement with regard to whether he saw Appellant and Rivera "fighting" through their front door or whether he saw them engaged in a "discussion." However, these variances were relatively insignificant given the fact that multiple witnesses saw Appellant and Rivera involved in a violent physical encounter both in the garage and in their house, and the fact that Appellant himself acknowledged as much during his police interview as well as at trial.[7] And more importantly, both A.R. and Roa testified at trial that the couple's fight escalated after they went inside the house, and that they heard Appellant make statements indicating his intent to shoot Rivera during the latter stages of their fight. In light of this evidence, the details of what May-Sum or Roa may have seen or heard during the early stages of the couple's fight would have had very little, if any bearing, on the jury's resolution of the only dispositive issue in the case, i.e., whether Rivera was shot intentionally or accidentally in the final moments of the fight, which neither May-Sum nor Roa witnessed.

As well, we conclude that Felicia's testimony regarding her prior conversation with Appellant regarding his stolen gun had little, if any bearing, on the issue of Appellant's guilt. As set forth above, there was no dispute at trial regarding the fact that there were guns in the couple's house and that Rivera was shot with one of those guns. Appellant admitted as much in his

---

[7] In fact, Appellant even acknowledged to police that Rivera was "screaming" and "yelling" at some point during their fight.

20

statement to police, and at trial, his defense counsel also acknowledged that there were guns in the house and that Appellant had access to the guns. Again, the only issue for the jury to decide was whether Appellant shot Rivera intentionally with one of those guns, and Felicia's prior conversation with Appellant would not have shed any light on that issue.

Accordingly, we conclude that any errors that occurred with regard to the prosecutor's use of the witnesses' prior statements did not influence the jury's verdict and were harmless in nature.

Appellant's Issue Two is overruled.

### ISSUE THREE: THE ADMISSION OF THE 911 RECORDING

In his third and final issue, Appellant contends that the trial court erred in admitting the recording of the call that Felicia Cheung made to the 911 operator to report the couple's fight. Appellant contends that the recording was inadmissible hearsay and that it did not fall within any exception to the hearsay rule. [8]

#### *Applicable Law and Standard of Review*

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Tex.R.Evid. 801(d). Generally, hearsay statements are inadmissible at trial, unless an exception to the hearsay rule applies. TEX.R.EVID. 802, 803. We review the trial court's decision to admit an out-of-court statement under an exception to the hearsay rule for an abuse of discretion, and we will not reverse the trial court's decision unless it falls outside the zone of reasonable disagreement. *See Zuliani v. State,* 97 S.W.3d 589, 595 (Tex.Crim.App. 2003); *see also Billodeau v. State,* 277 S.W.3d 34, 39

---

[8] Although Appellant failed to include the recording of the 911 call as part of the record on appeal, given the nature of the parties' legal arguments, we do not believe that this hinders our ability to adequately consider and dispose of this issue.

21

(Tex.Crim.App. 2009). When the trial court does not specify the hearsay exception upon which it relied in admitting evidence, we must uphold the court's decision if the ruling is "reasonably supported by the record and correct on any theory of law applicable to the case." *See Laney v. State,* 117 S.W.3d 854, 857 (Tex.Crim.App. 2003); *see also Gonzalez v. State*, 195 S.W.3d 114, 125-26 (Tex.Crim.App. 2006).

### *The Trial Court's Ruling*

At trial, Appellant objected to allowing the State to introduce the recording of Felicia's 911 call into evidence, arguing that it was inadmissible hearsay. The parties then discussed its admissibility under both the present sense impression exception to the hearsay rule, as well as the excited utterance exception. The trial court overruled Appellant's objection, and allowed the recording to be played for the jury, but did not specify the basis for its decision. After a portion of the recording was played, Appellant renewed his hearsay objection, and once again, the trial court overruled the objection without stating its basis for doing so.

### *The Excited Utterance Exception*

We first consider whether the recording was properly admitted under the excited utterance exception to the hearsay rule. The excited utterance exception to the hearsay rule is defined as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement that it caused." TEX.R.EVID. 803(2). "The basis for the excited utterance exception is 'a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani,* 97 S.W.3d at 595, *quoting Evans v. State,* 480 S.W.2d 387, 389 (Tex.Crim.App. 1972). Thus, the primary factor rendering

22

an excited utterance reliable is the spontaneous nature of the statement, and the statement must have been made before the declarant's excitement caused by the startling event or condition has abated. *Zuliani,* 97 S.W.3d at 596; *Tezeno v. State,* 484 S.W.2d 374, 379 (Tex.Crim.App. 1972); *see also Apolinar v. State*, 155 S.W.3d 184, 186 (Tex.Crim.App. 2005)(the key to the excited utterance exception is that the statement must have been made without reflection and without an opportunity to fabricate). Therefore, a reviewing court must determine whether a witness's statement was made "under such circumstances as would reasonably show that it resulted from impulse rather than reason and reflection." *Zuliani*, 97 S.W.3d at 596, *citing Fowler v. State,* 379 S.W.2d 345, 347 (Tex.Crim.App. 1964).

In determining whether a hearsay statement is admissible as an excited utterance under this standard, the court may look at the time that elapsed between the event and the statement, as well as whether the statement was in response to a question; however, neither of those two factors is dispositive. *See Penry v. State*, 903 S.W.2d 715, 750-51 (Tex.Crim.App. 1995); *see also Zuliani*, 97 S.W.3d at 595-96. Rather, the critical consideration is "whether the declarant [is] still dominated by the emotions, excitement, fear, or pain of the event" at the time he made his statements. *Zuliani,* 97 S.W.3d at 596, *quoting McFarland v. State,* 845 S.W.2d 824, 846 (Tex.Crim.App. 1992); *see also Salazar v. State,* 38 S.W.3d 141, 154 (Tex.Crim.App. 2001).

### Felicia was Still Under the Stress of Excitement When She Made the 911 Call

Appellant appears to concede that the event Felicia witnessed, i.e., the fight between Appellant and Rivera, was a startling event, and we agree. As set forth above, it was undisputed that Appellant and Rivera's fight was physically violent, and Felicia testified at trial that she was concerned for Rivera's safety as Appellant was "hitting" and "slamming" Rivera, and Rivera was

23

asking Appellant to stop but he was refusing to do so. Moreover, Appellant appears to concede that Felicia did not have time to reflect upon this startling event before making the 911 call, and we agree with this as well. The undisputed evidence reveals that Felicia made the 911 call while she was still observing the fight or immediately thereafter.

Appellant nevertheless contends that the statements made by Felicia during the 911 call cannot be considered excited utterances because Felicia maintained "a calm and composed tone" throughout the call. According to Appellant, Felicia's calm tone of voice establishes that she was no longer under the stress of excitement from viewing the couple's fight when she made the call, and therefore any statements she made during the call do not fit within this exception to the hearsay rule.

In considering Appellant's argument, we will assume for the sake of argument that Felicia did in fact speak in a calm tone throughout the 911 call. We note, however, that a witness's tone of voice when making a statement is not, standing alone, dispositive of the key question of whether the witness was still under the stress of excitement from viewing a startling event at the time the statement was made. *See, e.g., Daisy v. State*, No. 05-01-01791-CR, 2002 WL 31528723, at *2 (Tex.App--Dallas Nov. 15, 2002, no pet.)(not designated for publication)(recognizing that a witness need not be hysterical to be dominated by the emotions or fear of a startling event). To the contrary, when a witness makes a statement in a calm manner, it may still be considered an excited utterance if there is evidence that the witness was nevertheless still upset, scared, or otherwise in the grip of emotions as the result of a startling event when she made her statement. *See, e.g., Biggins v. State*, 73 S.W. 3d 502, 504 (Tex.App.--Fort Worth, 2002, no pet.)(trial court did not abuse its discretion in admitting victim's statements to police as an excited utterance,

24

despite the fact that victim appeared to have "calmed down" prior to making her statements, where she was still in the "grip of the emotions, excitement, fear, or pain" from her father's assault on her).

We find ample evidence in the record to support a finding that Felicia made the 911 call while she was still in the grip of emotions from viewing the violent fight between Appellant and Rivera. At trial, Felicia testified that she purposely tried to remain calm during her conversation with the 911 operator so that she could be understood, but that she was nevertheless still "upset" and "scared" at the time she made the call, as she believed the couple's fight was "pretty bad" and "pretty graphic." She further testified that when she made the 911 call, she was concerned for Rivera's safety due to the aggressive nature of Appellant's assault on her, and she believed that Rivera needed immediate assistance. Accordingly, we conclude that it was within the zone of reasonable disagreement for the trial court to conclude that the recording of Felicia's 911 call came within the excited utterance exception to the hearsay rule. [9]

### *Harmless Error Analysis*

And finally, even if we were to conclude that the trial court erred by admitting the 911 recording into evidence, we would not find that any such error warranted reversal of Appellant's conviction.

The improper admission of hearsay evidence is considered non-constitutional error, and as set forth above, such an error of this nature must be disregarded on appeal unless it affected the defendant's substantial rights. *See Walters v. State,* 247 S.W.3d 204, 219 (Tex.Crim.App. 2007); *Powell,* 88 S.W.3d at 800. Appellant argues that the admission of the 911 recording affected his

---

[9] In light of this conclusion, we need not consider the State's alternative argument that the 911 recording was also admissible under the hearsay exception for present sense impressions.

substantial rights, contending that it harmed his case in two respects. First, Appellant contends that the admission of the recording was harmful to his case because Felicia told the 911 operator that she believed Appellant had guns in the house. [10] According to Appellant, this statement was harmful as it was a comment on Appellant's "gun ownership." Even if we were to construe Felicia's statement as such, we do not believe that a comment on Appellant's gun ownership would have influenced the jury's verdict. The fact that Appellant owned guns was established through other evidence at trial; in particular, Roa testified at trial, without objection, that Appellant had previously told him that he owned two guns. Moreover, as explained above, there was no dispute at trial that there were guns in the couple's house, and the question of who owned those guns was not relevant to the only dispositive question in the case, i.e., whether Appellant intentionally shot Rivera with one of those guns.

Second, Appellant contends that the admission of the 911 recording was harmful to his case because it was the "only piece of evidence, excepting the cell-phone contents, that documented the events before the shooting in real time." We also disagree with this argument. As set forth above, multiple witnesses testified at trial regarding the events leading up to the shooting, and it was undisputed that Appellant and Rivera were involved in a violent fight prior to the shooting, which prompted Felicia's 911 call. Appellant has not pointed to any statements that Felicia made during the 911 call that differed in any respect from what the witnesses reported seeing the night of the shooting, or that would have otherwise had any prejudicial effect on the

---

[10] It appears that Felicia's statement was made in response to the 911 operator's question regarding whether Felicia knew if any weapons were involved in the couple's fight--a question presumably asked so that the operator could alert first responders to the potential dangers they might encounter upon their arrival at the scene. *See, e.g., Ford v. State*, No. 08-14-00093-CR, 2016 WL 921385, at *6-7 (Tex.App.--El Paso, Mar. 9, 2016, pet. ref'd)(not designated for publication)(911 operator properly asked caller if she knew whether the defendant had any weapons in order to ensure the safety of officers to be dispatched to the scene).

jury's deliberations.   Accordingly, we conclude that any error in admitting the 911 recording did not affect Appellant's substantial rights and was harmless in nature.

Appellant's Issue Three is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


August 28, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)